UNITED STATES of America, Appellee,

v.

William H. WILSON, Jr.,
Defendant, Appellant.

No. 85–1835.

United States Court of Appeals,
First Circuit.

Argued May 6, 1986.

Decided July 30, 1986.

Robert W. Harrington with whom Clark W. Yudysky, Serino, Harrington & Vernaglia and John W. Doukas, Boston, Mass., were on brief, for appellant.

Robert S. Mueller, III, First Asst. U.S. Atty., San Francisco, Cal., with whom Wil-

liam F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before BREYER and TORRUELLA, Circuit Judges, and MALETZ,* Senior Judge.

TORRUELLA, Circuit Judge.

This appeal arises from a three count indictment charging appellant William H. Wilson, Jr. (Wilson) with the willful failure to declare income on his tax returns for the years 1978, 1979 and 1980. *See* 26 U.S.C. § 7201. The jury returned a verdict of guilty on all three counts. The district judge imposed a six month sentence on each count to be served concurrently. Wilson was not fined.

After sentencing, Wilson filed a motion for stay of execution of sentence pending appeal, which was denied by the district court. Wilson then filed with this court three separate motions for bail and/or a stay pending appeal. These motions were denied by order of court, and the current appeal followed.

On appeal, Wilson's argument can be divided into two parts. First, he asserts that an incriminatory document written by him was protected by the attorney-client privilege, and therefore, was improperly admitted into evidence. Second, Wilson challenges a series of rulings by the district court premised on the court's finding that certain 1981 and 1982 events were irrelevant to the subject of trial, and therefore, could not be the subject of evidence, cross-examination or the instructions to the jury. For the reasons stated below, we reject appellant's arguments and affirm the judgment of the district court.

The evidence at trial showed that, during the indictment years of 1978, 1979 and 1980, appellant Wilson controlled the finances of New England Book Components, Inc. (NEBC), a printing company specializing in book components, dust jackets and paperback covers. NEBC had been founded in 1974 by Edmund Corvelli, James Middleton and Wilson as equal owners. Subse-

quently, James Moneghan, a printer, acquired a 10% interest.

The evidence showed that Wilson, in his 1978, 1979 and 1980 tax returns, failed to report substantial income taken by him from NEBC. This unreported income was divided into two categories: first, corporate funds paid to Wilson in complicity with the other owners; and second, corporate monies taken by Wilson without the other owners' consent, i.e., embezzled funds.

As to the first category, corporate funds paid to Wilson in complicity with the other owners, three methods were used. First, through a device known as the "personal ledger," the corporation would pay expenses of the four owners unrelated to the company business. Between 1978 and 1980, Wilson received $60,000 of such income, and did not report it. Second, Wilson, along with the other owners, would take a proportionate share of the cash sales of the business. Of this income, Wilson received $12,000 between 1978 and 1980, which was not reported. Third, the owners of NEBC formed a shell corporation, the Steven Green Paper Company (Company). Wilson would then write a check to the Company on a monthly basis, presumably as payment by NEBC on a fictitious purchase from the Company. The proceeds of the "sale" would then be distributed by the Company to its shareholders, Wilson, Corvelli, Middleton and Moneghan. Wilson received $8,000 of income from the Company in 1978, which he did not report. Thus, with the consent of his partners, Wilson received approximately $80,000 of unreported income from NEBC over the indictment years.

As to the monies that Wilson took without the consent of his partners, i.e., the embezzled funds, these constituted the bulk of the income not reported on the 1978, 1979 and 1980 returns. The evidence showed that NEBC owners Corvelli, Middleton and Moneghan had understood, in 1978, that the Steven Green Paper Company would no longer be used to divert income to any of the NEBC owners. How-

*Of the United States Court of International Trade, sitting by designation.

ever, in 1980, Middleton discovered various checks made out to the Steven Green Paper Company as well as other bookkeeping discrepancies. Middleton then alerted Corvelli, and when they confronted Wilson, he admitted to having taken the monies. Financial records introduced at trial revealed the embezzled amount to be approximately $350,000 over the indictment years. Wilson reported none of the embezzled money as income.

Thus, the evidence at trial showed that, during the indictment years of 1978, 1979 and 1980, Wilson received, both with and without the consent of the other owners, approximately $430,000 in unreported income. This unreported income, noted the government's expert witness, led to an additional unpaid tax liability for Wilson of approximately $40,000 in 1978, $108,000 in 1979 and $92,000 in 1980.

## I. ATTORNEY–CLIENT PRIVILEGE

■■■ Wilson's first argument on appeal is to challenge, on the ground of attorney-client privilege, the admission into evidence of a document written by Wilson and sent to attorney Karl Greenman. This document, known as the "Greenman Memo," contained an incriminating admission by Wilson that his unauthorized taking of monies from NEBC was "morally and ethically wrong," as well as a statement that the various income-enhancing schemes used by all the NEBC owners rendered him "no more or less guilty than the rest." Thus, through the Greenman Memo, Wilson not only admitted the embezzlement but also strongly implied that, as to the other NEBC schemes, all the partners (including himself) had done wrong.

In determining whether the district court's admission of the Greenman Memo constituted reversible error, we are called upon to decide the standard of review to be applied where evidence has been admitted by the trial court despite assertion of the attorney-client privilege. The government, relying on *United States v. Sorrentino*, 726 F.2d 876, 886 (1st Cir.1984), argues that a trial court's evidentiary rulings, in-

cluding rulings on the existence of a privilege, can be overturned only upon finding an abuse of discretion. Appellant, by contrast, cites *United States v. Petroziello*, 548 F.2d 20, 23 (1st Cir.1977) for the proposition that preliminary "factual" determinations under Fed.R.Evid. 104(a), such as the existence of a privilege, are to be decided by the trial court under the standard of preponderance of the evidence, and then reviewed on appeal subject to a clearly erroneous standard. *See, e.g.,* 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 104[04], at 104–29 to –31 (1985 ed.) (existence of attorney-client privilege is question of fact for the trial court); *Steiner v. United States*, 134 F.2d 931, 935 (5th Cir.), *cert. denied*, 319 U.S. 774, 63 S.Ct. 1439, 87 L.Ed. 1721 (1943) (same). Finally, while neither party has suggested the alternative, it might be possible that we engage in a *de novo* review and merely address the issue of whether the individual asserting the privilege, Wilson, has met his burden of showing the existence of the attorney-client privilege under *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–359 (D.Mass.1950) (Wyzanski, J.).

Because we regard the existence of a privilege as a factual determination for the trial court under Rule 104(a), the district court's finding of no privilege can be overturned only if clearly erroneous. Applying this standard, we see no error in the court's conclusion that Wilson failed to meet his burden under *United Shoe, supra.*

In order to assert the attorney-client privilege, Wilson was required to make four showings: (1) that he was or sought to be a client of Greenman's; (2) that Greenman in connection with the Memo acted as a lawyer; (3) that the Memo relates to facts communicated for the purpose of securing a legal opinion, legal services or assistance in a legal proceeding; and (4) that the privilege has not been waived. *United States v. United Shoe Machinery Corp., supra,* at 358–359; *Connelly v. Dun. & Bradstreet, Inc.,* 96 F.R.D. 339, 341 (D.Mass.1982). We address the above criteria in turn and emphasize that, if Wil-

son fails to meet his burden as to any one element, the privilege cannot be invoked.

First, as to whether Wilson was or sought to become Greenman's client, the facts ultimately do not support Wilson's claim that he met his burden below. Greenman testified that, in December 1980, he was approached by Corvelli, Middleton and Moneghan to represent NEBC in the buyout of Wilson's interest. Greenman further testified that, while he had represented Wilson on personal matters in the past, such representation would be commenced by a meeting where Wilson would effectively state "I need your legal services." No such meeting took place between Greenman and Wilson with respect to the buyout. Moreover, the only communication between them, the Memo itself, does not sufficiently convey an intent on Wilson's part to retain Greenman as his attorney. Finally, Greenman testified that all work previously done by him for Wilson was paid for on a project basis, and that no such payment was made by Wilson to Greenman in connection with the latter's role in the buyout. Thus, despite the fact that Greenman had represented Wilson in the past, and despite Greenman's statement that he never gave a thought to whom he was representing, the evidence of NEBC's specific retention of Greenman for purposes of the buyout, when combined with the total lack of evidence indicating an intent on Wilson's part to become a client of Greenman's for purposes of the buyout, leads us to conclude, as did the district court, that no attorney-client relationship existed at the time the Memo was sent.

Second, as to the requirement that Greenman act as a lawyer in connection with the Memo, the evidence is uncontroverted that he did not. The only testimony on this point is Greenman's, where he stated that "I had hoped to get into the role of negotiator, but it was really more of the informant." Thus, given Greenman's own characterization of his role as that of messenger, the evidence clearly supported the district court's conclusion that Wilson had not met his burden of showing that Greenman acted as an attorney in connection with the Memo.[1]

Third, regarding the requirement that the Memo relate to facts communicated for the purpose of securing legal advice, services or assistance in a legal proceeding, it is necessary to examine the Memo's contents. As previously noted, the Memo does not evince an intent on Wilson's part to secure Greenman as his attorney. Rather, the contents of the Memo communicate the methodology used by Wilson to value his shares, an admission by Wilson that what he did was wrong, and an implicit threat that if Wilson finds himself in a position of defense, he will use the other owners' failure to report income as part of that defense. The Memo, in short, communicates Wilson's position for purposes of buyout negotiations, where the role of the attorney recipient was not to negotiate as an advocate or provide legal advice, but merely to relay the settlement figures to the attorney's actual clients, Corvelli, Middleton and Moneghan. Thus, given that the Memo did not communicate facts for the purpose of securing a legal opinion, services or representation, we conclude that the district court's finding of no attorney-client privilege was not clearly erroneous.

Fourth, as to the requirement that Wilson show no waiver of the privilege, we note that, since no privilege exists under the above three criteria, discussion of waiver is unnecessary. Accordingly, we affirm the district court's conclusion of no privilege, and therefore reject appellant's contention that admission of the Greenman Memo constituted reversible error.

---

**1.** This conclusion seems especially appropriate given Greenman's testimony that if he gave any advice with respect to the buyout terms, it was always directed to Corvelli, Middleton and Moneghan, but never to Wilson. Thus, while the absence of any legal advice given by Greenman to Wilson further supports the lack of an attorney-client relation between them with respect to the buyout, it also supports the conclusion that, as to the Memo itself, Greenman's role was not to advise Wilson but rather to convey Wilson's position to Greenman's real clients, the remaining principals of NEBC.

■ Wilson raises two final points regarding the Greenman Memo. First, he argues in the alternative that, assuming the Memo was admissible and relevant, it should have been excluded under Fed.R. Evid. 403, on the ground that the jury heard from Wilson only through the Memo, and that the prejudicial nature of the Memo's incriminatory statements substantially outweighed their probative value. We disagree, both because Wilson never raised a Rule 403 objection to the Memo below, and because even if he had, we see no greater prejudice in the Memo's incriminatory statements than that which necessarily inheres in any freely made, extra-judicial admission by a defendant. Thus, while Wilson may object to the admissions exception to the hearsay rule, we do not find its application below as generating excessive prejudice given the probative value of a handwritten incriminatory statement uttered without any indication of coercion whatsoever. *See, e.g., United States v. Fahey,* 769 F.2d 829, 841 (1st Cir.1985) (standard for exclusion of evidence as unfairly prejudicial is high); *Dollar v. Long Mfg., N.C., Inc.,* 561 F.2d 613, 618 (5th Cir.1977) (virtually all material evidence is prejudicial; test is for unfair prejudice).

■ Second, Wilson argues that he was deprived of due process by not being allowed access to alleged exculpatory evidence in attorney Greenman's file. When Wilson requested access to such documents below, an attorney for NEBC testified that the documents had not been disclosed to the government and that NEBC, as Greenman's client, would assert the attorney-client privilege as to the file. The district court nonetheless conducted an *in camera* review and found none of the documents to be exculpatory. Wilson objected to the court's ruling but did not move to seal the documents and include them as part of the record on appeal.

Given the state of the record before us, we reject Wilson's due process claim for three reasons. First, the undisputed evidence before the trial court was that *only* the Greenman Memo had been disclosed to the government. Thus, as to the remaining documents in Greenman's file, the record below supports an uncontested attorney-client relation between Greenman and NEBC, and no waiver of the privilege as asserted by NEBC counsel. Second, given that the remaining Greenman documents were never disclosed to the government and not in the government's possession, this case would not appear to fall within the mandatory disclosure rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Third, even assuming alleged exculpatory evidence in the hands of a third party falls under *Brady* or that disclosure can nonetheless be required on due process fairness grounds, appellant Wilson's counsel has failed to provide us with an adequate record on appeal to review the *in camera* findings below. More importantly, appellant has failed to meet the *Brady* requirements of showing that the evidence be in fact exculpatory, material to the case, and that the lack of disclosure resulted in undue prejudice. *United States v. Drougas,* 748 F.2d 8, 23 (1st Cir. 1984). Accordingly, given (1) that the Greenman documents at issue appear to be privileged, (2) that *Brady v. Maryland, supra,* may be inapposite, and (3) that regardless, appellant has failed to provide an adequate record or reasons on appeal to find prejudicial error under *Brady,* we reject appellant's contention that nondisclosure of the Greenman file violated due process.

## II. DISTRICT COURT RULINGS ON WILSON'S THEORY OF THE DEFENSE

Appellant Wilson raises various arguments relating to grand jury proceedings, evidentiary rulings by the district court, instructions to the jury and the denial of his motion for acquittal. The common ground of Wilson's arguments is a challenge to the district court's conclusion that the 1982 buyout of Wilson's shares by NEBC had *never* been shown to be relevant to the subject of trial, i.e., Wilson's intent in filing tax returns for the years 1978–1980. Thus, in order to understand

the claims raised by Wilson, the basis of the district court's rulings, and the relevance or nonrelevance of the 1982 events, it is necessary to explain both the government's and Wilson's theories at trial.

The government's theory was simple. It argued that if as a matter of fact the jury found that Wilson had received the monies at issue, then as a matter of law both the funds received by Wilson with the consent of his partners, as well as the embezzled monies, were "income" that had to be declared in the years received. *See James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961) (embezzled funds are taxable income in the year received). Thus, because the government would offer proof that Wilson willfully failed to declare such income in the years 1978, 1979 and 1980, it urged the jury to convict for tax evasion under 26 U.S.C. § 7201.

The defense presented no witnesses, and Wilson did not take the stand. However, Wilson's counsel argued, in an extremely convoluted theory of the defense, that Wilson had received the 1978–1980 monies as advance payments, to be held in escrow, for a purchase of his ownership interest in NEBC to be culminated in 1982. To support this theory, Wilson's counsel sought to introduce evidence of a 1982 stock redemption transaction between Wilson and NEBC, whereby in exchange for absolution on his embezzlements, Wilson would surrender his stock, free of charge, as restitution for the monies taken.

The argument of Wilson's counsel, then, was that the 1982 transaction had all along been contemplated by Wilson in 1978–1980, and that the monies taken in 1978–1980 were advance payments, to be held in escrow, on a capital gains stock redemption transaction set to take place in 1982. Thus, since Wilson paid a capital gains tax in 1982, his counsel argued that no willful intent to evade taxes could be found as to the years 1978–1980, where Wilson allegedly regarded his role not as a recipient of income, but as a mere escrow account "trustee."

Despite these arguments, the trial court consistently denied Wilson's counsel's attempts to introduce evidence on the 1982 events, to cross-examine witnesses as to 1982, or to have the jury instructed on Wilson's theory. The court's reason was that no foundational evidence had been provided to show that Wilson or anyone else contemplated the 1982 events in 1978–1980, or more specifically, that Wilson had taken the 1978–1980 monies with a specific intent to hold them in escrow and pay a capital gains tax in 1982. Thus, the trial court reasoned that if the testimony at trial regarding the indictment years, 1978–1980, showed no connection or contemplation by anyone of the 1982 buyout, then Wilson's theory, that the 1978–1980 monies were prepayments on a 1982 transaction, was not only totally unfounded but irrelevant and confusing to the subject of trial. With this background in mind, we now address the main issues raised by Wilson.

### 1. *Refusal of the district court to admit evidence relating to the 1982 buyout*

In denying Wilson's renewed motion for release on bail pending appeal, we stated:

> The mere fact that the buyout took place does not by itself establish its relevance to Wilson's previous state of mind. Wilson points to no testimony that would provide adequate foundation for admission of this evidence.

*United States v. William H. Wilson, Jr.*, (1st Cir. Nov. 27, 1985) (order denying renewed motion for bail pending appeal).

██ After reviewing Wilson's contentions on appeal, our position has not changed. We have again scrutinized the record and find nothing to connect the events of 1982 to Wilson's state of mind in 1978, 1979 and 1980. Wilson's counsel represented to the district court on at least two occasions that a foundation would be provided through Wilson's own testimony; however, Wilson never took the stand. Thus, because no foundational facts were presented to establish the relevancy of the 1982 buyout to Wilson's state of mind during the indictment years, and because the

district court is to be accorded broad discretion in admitting conditionally relevant material, Fed.R.Evid. 104(b); *Walker v. Trico Manufacturing Co.,* 487 F.2d 595, 599 (7th Cir.1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), we reject appellant's contention that the exclusion of the evidence below amounted to an abuse of discretion.

■ Apart from arguing that he presented sufficient foundational evidence below, Wilson asserts that evidence on the 1982 events should have been admitted as post-filing or post-indictment activity bearing on a defendant's intent. *See United States v. O'Connor,* 433 F.2d 752, 754–755 (1st Cir. 1970), *cert. denied,* 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 409 (1971). However, as the government notes, it is not *required* that post-indictment evidence be admitted, and like all evidence, it must survive threshold challenges to relevancy. Thus, we are back to the question of whether the 1982 evidence Wilson sought to introduce was relevant, and, as noted above, defendant has failed to make such a showing.

■ Appellant argues in the alternative, however, that since the testimony of government witnesses Greenman and Corvelli indicated the 1982 buyout to have been first contemplated in late 1980 or early 1981, then it follows that, at least with respect to Wilson's intent on the 1980 return (filed in April 1981), the 1982 events should have been admissible. We disagree for two reasons. First, Wilson's counsel never coherently raised this point below, and thus did not provide the district court an opportunity to consider admissibility of the 1982 evidence for the limited purpose of Wilson's intent on the 1980 tax return. Second, even if Wilson's counsel had raised the issue, we do not see a sufficient foundation to establish relevancy. The evidence regarding Wilson's "intent" in late 1980 and early 1981 was essentially that the buyout had been contemplated, and presumably, that Wilson would tender his shares as restitution for the embezzlement. Thus, while this evidence admittedly shows that the buyout was tentatively contemplated in the early months of 1981, it does not provide a foundation to show an intent on Wilson's part, when he filed his 1980 return in April 1981, *to hold the embezzled monies in escrow and to pay a capital gains tax upon the culmination of the buyout in 1982.* It was to support this latter intent that Wilson sought to introduce the 1982 evidence, and it is specifically with respect to this latter intent, i.e., the intent in April 1981 to subsequently pay a capital gains tax, that no foundational evidence was provided at all. Accordingly, we conclude that the district court, in excluding all evidence regarding the buyout as irrelevant to Wilson's intent during the indictment years, did not abuse its discretion.

■ Finally, we note that, contrary to Wilson's allegations, there was no contradiction in allowing the government to admit certain post-indictment evidence whereas Wilson could not. Unlike Wilson, the government established the relevancy of its evidence. The government's post-indictment evidence consisted of (1) an amended 1978 tax return, filed in 1982, upon which the government expert calculated Wilson's tax deficiency in 1978, and (2) the Greenman Memo, written in 1981, wherein Wilson virtually admitted to having embezzled funds in 1978–1980. Thus, while the same standard of relevance must be applied to both parties by the trial court, *United States v. Latham,* 754 F.2d 747, 751 (7th Cir.1985), it does not follow that because one party meets its burden the other is excused. Accordingly, because Wilson never presented sufficient foundational facts to support the relevancy of evidence regarding 1982 events, we affirm the district court's exclusion of such evidence as entirely within its discretion.

### 2. *Exclusion of Expert Testimony*

■ The district judge ruled that appellant's expert, Lucien Gauthier (Gauthier), would be relying on unsupported assumptions and inadmissible evidence in his testimony. Thus, Gauthier was not allowed to take the stand. On appeal, Wilson claims that the exclusion of Gauthier's proposed

testimony constituted reversible error. We disagree.

Under Rule 703, the admission of expert testimony is a matter reserved to the trial court's discretion. 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 703[01], at 703–4 (1985 ed.). Gauthier was expected to testify that he reviewed both NEBC's and Wilson's 1982 tax returns and that Wilson's treatment of the stock redemption transaction as generating a capital gain was appropriate. Finally, *under the assumption that Wilson took the 1978–1980 monies with an intent to hold them in escrow,* Gauthier was to testify that no tax was due in those years and that the 1982 capital gains treatment was correct.

As the government notes, the problem with Gauthier's proposed testimony is that there was no evidence in the record to support the central assumption upon which it would be based. Thus, we agree with the district court that the testimony was excludable as guesswork, conjecture and speculation that would serve only to confuse the jury. *See Polk v. Ford Motor Co.,* 529 F.2d 259, 271 (8th Cir.) (en banc) ("[t]here must, of course, be sufficient facts already in evidence ... to take [expert] testimony out of the realm of guesswork and speculation."), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976); *Gilbert v. Gulf Oil Corp.,* 175 F.2d 705, 709 (4th Cir.1949).

As to appellant's arguments that the government expert Peter Labelle provided a foundation for Gauthier's testimony, this contention is meritless. Labelle merely answered hypothetical questions asked by Wilson's counsel on cross-examination, and he provided no factual basis for Wilson's theory.

Finally, the cases relied on by appellant, *United States v. Garber,* 607 F.2d 92 (5th Cir.1979) (en banc) and *Virginia Iron Coal & Coke Co. v. Commissioner of Internal Revenue,* 99 F.2d 919 (4th Cir.1938), *cert. denied,* 307 U.S. 630, 59 S.Ct. 833, 83 L.Ed. 1513 (1939), are inapposite. *Garber* did

involve a reversal based in part on the district court's exclusion of a defendant's expert testimony; however, unlike the present case, it was clear that the facts underlying the assumptions of defendant's expert were well-developed in the record. 607 F.2d at 94–96. As to *Virginia Iron Coal & Coke Co., supra,* the opinion never addresses the issue of expert testimony, and at best stands for the proposition that certain annual option payments applicable to the purchase price are not taxable in the year received, which is analogous to defendant's theory of "take now, pay later," but which is of course inapposite given that defendant's theory has no factual basis in the record.

Accordingly, because there is no factual basis in the record for the proposed testimony of defense expert Gauthier, we conclude that the district court's exclusion of such testimony, on the ground that it constituted unfounded guesswork and conjecture, was proper.

### 3. *Grand Jury*

 Wilson argued below, in a motion to dismiss the indictment, that his due process rights were violated due to alleged grand jury abuses by the prosecutor, specifically, the failure to disclose exculpatory evidence. This motion was denied, and Wilson again raises the issue on appeal.

The "exculpatory" evidence not disclosed to the grand jury was both the 1982 tax returns and certain 1983 financial statements of Wilson and NEBC. As noted above, this evidence has *never* been shown to be relevant by Wilson to his state of mind during the indictment years; thus, its characterization as exculpatory is inaccurate, to say the least. More importantly, we endorse the rule that the prosecutor is normally not under a duty to disclose exculpatory evidence to the grand jury. *United States v. Civella,* 666 F.2d 1122, 1127 (8th Cir.1981); *United States v. Ciambrone,* 601 F.2d 616, 622–623 (2d Cir.1979).[2] Thus,

2. The exception to this rule, that an obligation to disclose "should" exist where the prosecutor is aware of substantial evidence negating guilt, is not before us. *See Ciambrone, supra,* at 623.

because the 1982 evidence not disclosed to the grand jury cannot be fairly characterized as exculpatory, and because prosecutors regardless are not under a general duty to disclose such evidence to the grand jury, we reject appellant's contentions and affirm the district court's denial of the motion to dismiss.

### 4. *Limitation of Cross-Examination*

 The district court restricted Wilson's right of cross-examination as to government witnesses Labelle, Corvelli and Middleton. Specifically, the district court limited Wilson's counsel's interrogation of these witnesses as to the 1982 events, since, as noted above, Wilson had not established the relevancy of 1982 to the indictment years.

We acknowledge Wilson's point that an accused must be provided broad latitude in questioning government witnesses. *See United States v. Tracey*, 675 F.2d 433, 437 (1st Cir.1982). However, the license to cross-examine is not absolute, especially where, as here, the purpose of cross-examination was to place a theory before the jury with no factual basis. *See Oberlin v. Marlin American Corp.*, 596 F.2d 1322, 1328–1329 (7th Cir.1979). Moreover, it is a distortion of the record to state that Wilson's right of cross-examination was significantly impaired. As to Corvelli and Middleton, Wilson was allowed to cross-examine them regarding their profits due to the buyout, the pending IRS investigations of them, and their consequent adversary relation to Wilson, facts which, if believed by the jury, could significantly have impaired these witnesses' credibility. As to LaBelle,

Wilson's counsel extensively cross-examined him as to his assumptions, methodology and the bases for his conclusions, which again served to expose weak points in the testimony.

Thus, because trial courts are to be accorded broad discretion in determining the scope of cross-examination, *United States v. Nogueira*, 585 F.2d 23, 25 (1st Cir.1978), because Wilson was provided sufficient opportunity to question government witnesses on bias and critical areas of testimony, and because the restricted areas of questioning pertained to a factually unsupported theory of the defense, we conclude that the district court's limitation of cross-examination was wholly appropriate.

### 5. *Jury Instructions*

 Wilson here claims that the district court, by not instructing the jury on his theory of the defense, committed reversible error. Moreover, Wilson objects to the trial court's instruction that if the jury found as a matter of fact that Wilson had received payments from the corporation for personal expenses or that Wilson had taken monies without authorization, then as matter of law, the monies were taxable income. *See James v. United States, supra.*

We find no error in the court's instructions. In order to create a factual issue and obtain an instruction on the "income" versus "capital gain" status of the 1978–1980 monies, Wilson was required to offer evidence, not allegations by counsel, supporting an escrow account holder intent during the indictment years.[3] Without a single foundational fact to support his theory, Wilson could not request an instruction

---

Therefore, we do not opine as to its viability in this circuit. *Compare United States v. Leverage Funding Systems, Inc.*, 637 F.2d 645, 648 (9th Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981) ("prosecutor has *no* duty to present evidence in his possession which tends to negate guilt") (emphasis added).

**3.** The case relied on by appellant, *United States v. Pisani*, 773 F.2d 397 (2d Cir.1985), is inapposite. In *Pisani*, a conviction for tax evasion was reversed because the district court instructed the jury that campaign gifts used for personal, not political, purposes were taxable income.

The Second Circuit found the instruction to be plain error because as a matter of law campaign contributions could retain their nontaxable gift status if the donor's intent was to make an unconditional contribution, and because the defendant at trial had created a factual issue as to donor intent by presenting witnesses who testified that their campaign contributions had been unconditional. Thus, unlike Wilson, the defendant in *Pisani* presented evidence supporting his theory of the defense, and accordingly, was entitled to an instruction on it.

on it. Likewise, by not presenting a single fact on the income versus capital gain distinction, Wilson has no basis to challenge the trial court's instruction that the monies received were income. Accordingly, we find appellant's objection to the charge to be without merit.

In light of the foregoing analysis, we find the remainder of appellant's claims to be meritless. Accordingly, the judgment of the district court is *affirmed*.