**TOWNS OF NORFOLK AND WALPOLE, Plaintiffs,**

v.

**The UNITED STATES ARMY CORPS OF ENGINEERS; Lt. Colonel James K. Hughes, in his capacity as the District Engineer; and the Massachusetts Water Resources Authority, Defendants.**

Civ. A. No. 91–10771–MA.

United States District Court, D. Massachusetts.

June 19, 1991.

Stephen Daniel Anderson, Anderson & Kreiger, Boston, Mass., Christopher H. Little, Tillinghast, Collins & Grahams, Providence, R.I., Leonard Kopelman, Kopelman & Paige, P.C., John W. Giorgio, Kopelman & Paige, P.C., Boston, Mass., for plaintiffs.

George Bunsen Henderson, U.S. Attorney's Office, Boston, Mass., Steven H. Goldberg, Massachusetts Water Resources Authority, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

The plaintiff Towns of Walpole and Norfolk ("the Towns") filed this suit to challenge the issuance by the U.S. Army Corps of Engineers of permit no. 199000033 pursuant to § 404 of the Clean Water Act, 33 U.S.C. § 1344; § 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403; and the regulations promulgated thereunder. The permit in question approved various aspects of the long-term residuals management plan developed by the defendant Massachusetts Water Resources Authority (MWRA) in connection with the court-ordered clean-up of Boston Harbor. The Towns challenge the permit insofar as it approves the alteration of wetlands at a site in Walpole for the construction of a residuals landfill. This challenge to the Corps of Engineers' decision is

brought under § 706 of the Administrative Procedure Act, 5 U.S.C. § 706.

In the course of litigation, the Towns subpoenaed the keepers of the records for the United States Attorney for the District of Massachusetts and for Region I of the United States Environmental Protection Agency (EPA) to appear for depositions and to produce all documents concerning communications between those agencies and the Corps of Engineers relating to the Walpole site. The U.S. Attorney and EPA, along with the defendants, the Corps of Engineers and MWRA, in response, sought a protective order and an order quashing the subpoenas. This court temporarily stayed discovery while ordering production of the documents in question to the court for *in camera* inspection.

In challenges to agency actions brought under § 706, it is well settled that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Given this starting point, the purpose of my *in camera* inspection was to determine whether the documents responding to the subpoena should have been included in the administrative record or whether they should be discoverable even though not properly part of the administrative record; if the answer to either of these questions is in the affirmative, I must then decide whether the U.S. Attorney and EPA should be allowed to withhold the documents under various claims of privilege.

*I. Are the documents part of the administrative record?*

The Towns argue initially that the subpoenaed documents include materials that should originally have been included in the administrative record. The administrative record "is that which was before the agency at the time the decision being reviewed was made, and it 'consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position.'" *National Wildlife Fed'n v. Burford,* 677 F.Supp. 1445 (D.Mont.1985) (quoting *Exxon Corp. v. Department of Energy,* 91 F.R.D. 26, 33 (N.D.Tex.1981)).

Before considering the documents answering to the subpoena, it is first useful to describe why the Towns believe that communications among the U.S. Attorney, the EPA, and the Corps of Engineers might include information "directly or indirectly considered" by the Corps. The administrative record includes a memorandum dated January 23, 1991, written by a branch chief of the Corps' Regulatory Division, David H. Killoy, Administrative Record Document No. 117 [hereinafter A.R. No.], in which Mr. Killoy openly voiced his reservations about the Walpole site. (This memorandum updated a prior memorandum dated December 24, 1990, A.R. No. 59, on the same topic.) In addition, the record contains the January 4, 1991, memorandum of Christine Godfrey, chief of the Regulatory Division's Policy Analysis Branch, A.R. No. 57, in which Ms. Godfrey summarizes a telephone conversation with Mike Davis of the Justice Department. The memo reflects that in that conversation Mr. Davis told Ms. Godfrey that the Justice Department and EPA "want[ ] the transfer [of the Walpole site to MWRA for use as a landfill] to occur," although "[t]ransfer itself is not binding on the Corps permit decision." Ms. Godfrey informed Mr. Davis that the Corps "wanted to urge the MWRA to withdraw Walpole from the application at this time" and was preparing a letter to that effect. The letter was never sent, and the permit was issued February 11, 1991. On the basis of these entries in the administrative record, the Towns conclude that there was opposition to the permit for the Walpole site within the Corps of Engineers, but that the Justice Department exercised improper influence to see that the permit was issued nonetheless. If this is so, the Towns argue, then communications among the Corps of Engineers, the U.S. Attorney, and EPA may include materials that the Corps considered in reaching its decision.

The submission of the U.S. Attorney and the EPA in response to this court's order for *in camera* inspection consists of 38

documents from the former and 19 from the latter. With regard to all but seven of the documents submitted, I am able to conclude upon facial examination and consideration of the authenticating declarations that they do not belong in the administrative record for the very simple reason that they were never seen by Corps of Engineers personnel and, therefore, could not have been considered in deciding to issue the permit.

Assistant United States Attorney (AUSA) George B. Henderson classified the documents in the possession of the U.S. Attorney into four categories. Category II includes handwritten notes of AUSA Henderson and of the Justice Department's Environmental Enforcement Section's counsel Cynthia Huber regarding conversations with Corps of Engineers personnel. Category III includes memoranda and electronic mail messages among attorneys in the Environmental Enforcement Section relating to the permitting process. These documents were never in the possession of the Corps of Engineers and thus are not properly included in the administrative record. (The seven more troublesome documents comprise AUSA Henderson's categories I and IV.)

Likewise, EPA counsel Jeffry T. Fowley classified into three groups the documents in EPA's custody answering to the subpoena. Category I includes handwritten notes of EPA regional counsel relating to conversations with Corps of Engineers personnel. Category II consists of notes taken by EPA technical personnel regarding conversations with Corps of Engineers personnel. Category III contains memoranda from an EPA consultant to the EPA regarding the Corps of Engineers' consideration of the Walpole site. None of the documents in any of these categories ever reached the Corps of Engineers; thus, the Corps could not have considered these documents in the permitting process. None belongs in the administrative record.

■ What remain for consideration are seven documents that were seen by Corps of Engineers personnel. Six of these are letters from the U.S. Attorney's office (five written by AUSA Henderson and one written by U.S. Attorney Wayne A. Budd) to the Corps of Engineers (two addressed to each of Lt. Col. James K. Hughes, Col. Phillip R. Harris, and Assistant District Counsel Gary Pasternak); the seventh document is an unsigned draft of a letter from Col. Harris to Richard D. Fox of MWRA (the "Harris–Fox draft letter"), which was provided to AUSA Henderson by Corps of Engineers counsel Pasternak. (This is the letter alluded to in the Godfrey memo.) The U.S. Attorney and the defendants take the position that these seven documents are not part of the administrative record because they contain no *factual* information about the Walpole site and, therefore, were not relied upon by the Corps of Engineers in reaching its decision.

My *in camera* review verifies the first part of the U.S. Attorney's assertion: none of the seven letters in question includes any factual information. The conclusion that the Corps of Engineers could not have relied upon anything in the letters in reaching its decision, however, does not necessarily follow. In theory, it is possible that communications between executive agencies might contain *policy* recommendations that the Corps of Engineers may have considered. The question before me, therefore, is whether the letters in question include such policy recommendations.

The six letters from the U.S. Attorney's office basically concern two subjects. First, they deal with the coordination of the Corps of Engineers' action with the U.S. Attorney. At the time these letters were written, the U.S. Attorney was engaged in defending another lawsuit filed by the Towns challenging the EPA's issuance of an Environmental Impact Statement with regard to the Walpole site. The U.S. Attorney was also representing the EPA in the Boston Harbor litigation, and had recently filed a controversial motion for this court to order the Commonwealth of Massachusetts to transfer title of the Walpole site to the MWRA. Moreover, the U.S. Attorney would likely represent the Corps in a suit challenging the validity of the permit. Thus, the U.S. Attorney expressed a strong

desire to be notified in advance of any Corps of Engineers action regarding the Walpole site. Second, the letters concern whether the Corps should include the two Killoy memoranda and the Harris–Fox letter in the administrative record. None of the six letters in question makes any policy recommendations with respect to issuing the permit. Although the U.S. Attorney's office clearly expressed its desire to see the permit issue and asked to be kept informed of the Corps' progress in reaching a decision, the letters (with one minor exception) never comment on the merits of the petition. The exception is one sentence that appears in two of the letters, in which AUSA Henderson expresses his opinion that Killoy's application of the EPA's § 404(b)(1) guidelines was "faulty." The letter gives no legal, factual, or policy reason for this conclusory statement, and the statement was made only to support the U.S. Attorney's position that the memoranda were "deliberative." It is therefore highly unlikely that the Corps of Engineers would have relied on this statement in deciding the permit question. In the event that the Corps did consider this opinion, however, the communication in question would clearly be protected as an attorney-client communication. *See infra* pp. 189–190.

Unlike the first six letters, the Harris–Fox draft letter does include significant substantive statements regarding the Corps of Engineers' permitting decision. As intimated in the Godfrey memo, the draft letter informs MWRA that the Corps had reservations regarding the Walpole site and suggests possible avenues of action, including withdrawal of the Walpole site from consideration. Quite importantly, however, the draft letter does not set out materials that the Corps considered in making its decision; rather, it voices a conclusion reached by certain Corps of Engineers personnel on the basis of the materials at their disposal. Put differently, the draft letter, which expressed a position that the Corps eventually dropped, was a deliberative document.

In summary, four of the six U.S. Attorney letters and the Harris–Fox draft letter

do not belong in the administrative record, as they were not considered by the Corps of Engineers in issuing the permit. But this is not the end of the court's inquiry with respect to these documents.

## II. Should the court look beyond the administrative record?

■ Although § 706 review is generally limited to the administrative record before the agency, in unusual cases a reviewing court is justified in looking beyond the record. The Towns' papers suggest two reasons for doing so in this case: (1) the documents in question are necessary to explain the agency's action, and (2) there was bad faith or irregularity in the permit process.

The Towns rely on *Friends of the Earth v. Hintz*, 800 F.2d 822 (9th Cir.1986), for the proposition that the court may inquire outside the administrative record if necessary to explain an agency decision. The Towns argue that the court should now—before it has reviewed the administrative record—expand its review to material outside the record "to determine whether the agency fully explicated its course of conduct or grounds of decision." Memorandum in Opposition to Motion to Quash at 10. This reading of the *Hintz* case, however, turns on its head the rule that review is to be limited to the administrative record and gets *Hintz* backwards. In *Hintz*, which involved the review of a Corps of Engineers permitting decision, the court said the following with regard to opening up the record to explain agency action:

A court may consider evidence outside the administrative record as necessary to explain agency action. When there is "such a failure to explain administrative action as to frustrate effective judicial review," the court may "obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary." The purpose of the court's enquiry should be to ascertain whether the agency considered all relevant factors or fully explicated its course of conduct or grounds of decision.

*Id.* at 829 (citations omitted). As was the case in *Hintz*, the first place the court should look to determine whether the agency decision can be explained on the basis of the record is the record itself. Only if the record is so scant that it frustrates judicial review would the court be justified in opening up the record to search for further explanation of the agency's action.

■ The Towns also claim that the EPA, Department of Justice, and the U.S. Attorney improperly pressured the Corps of Engineers. The court is justified in looking past the administrative record when bad faith is claimed. *Public Power Council v. Johnson*, 674 F.2d 791, 795 (9th Cir.1982). "Normally there must be a strong showing of bad faith or improper behavior before the court may inquire into the thought processes of administrative decisions." *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). On the basis of my *in camera* review, I find that the documents in question here do not provide such a showing.

■ None of the materials submitted by EPA even suggest bad faith, as the communications reflected in these pertain primarily to technical issues. Most of the U.S. Attorney's submissions are similarly innocuous. For the most part they indicate—contrary to the assertion that the U.S. Attorney had any influence over the Corps—that the Corps was reluctant to cooperate with the U.S. Attorney. A few of the U.S. Attorney's submissions, however, require some further consideration.

■ The Harris–Fox letter, which represents the thinking of the Corps itself, ultimately falls short of the requisite showing of bad faith. The draft letter indicates that in early January some Corps of Engineers personnel had reservations about the Walpole site. Because the Corps evidenced a change of opinion, the Towns assume that there must have been some bad faith or improper conduct. The Towns' subpoena with respect to this draft letter amounts to an attempt to justify inquiring into the Corps' deliberations. Even if I were to find that the Harris–Fox letter contained strong evidence of bad faith, which I do not, I would still be compelled to keep this deliberative document out of the public record, for it is well settled that an agency's internal deliberations are privileged. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975) (discussing, in context of Freedom of Information Act, the benefits to the decision-making process of the deliberative privilege). The case at bar demonstrates exactly why this privilege exists. If the Corps of Engineers had to fear that any internal communications inconsistent with its final action would be subject to public scrutiny, the consideration of contrary viewpoints, such as Killoy's, would be inhibited. The fact that there was divided opinion within an executive agency does not automatically imply bad faith.

■ The U.S. Attorney's submissions in Category III consist of a letter and a memo from AUSA Henderson to the Justice Department's Environmental Enforcement Section personnel and five electronic mail messages among Environmental Enforcement Section personnel and a Deputy Assistant Attorney General. These letters reflect the U.S. Attorney's concern that the Corps of Engineers would take a position inconsistent with the Government's stance in other litigation concerning the Walpole site. These communications indicate that some "high-level" discussions were held among executive branch officials and that the District Engineer, the individual with direct responsibility for the permit, eventually told the Justice Department to "relax." Any causal connection between these two events is left to inference.

The decision whether to require disclosure of these communications raises some interesting legal and policy issues. The Towns, citing *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C.Cir.1971), argue that agency decisions must not be based either in whole or in part on irrelevant factors. In *Volpe*, in reviewing the Secretary of Transportation's decision to approve construction of a bridge across the Potomac between the District of Columbia and Virginia, the court was faced with the

undisputed evidence that a member of the House Appropriations Committee, who was also chairman of the District of Columbia subcommittee, had made it clear that funding for the District's rapid transit system was contingent on approval of the bridge. The court remanded consideration of the bridge to the Secretary to "make new determinations based strictly on the merits and completely without regard to any considerations not made relevant by Congress in the applicable statutes." *Id.*

The defendants, on the other hand, argue that the evidence at issue here relates to legitimate intra-executive communications necessary for the executive branch to take consistent policy positions. The defendants cite *Sierra Club v. Costle*, 657 F.2d 298, 404–07 (D.C.Cir.1981), for the proposition that intra-executive contacts need not be disclosed when they do not concern factual data on which the agency decision was based.

In *Costle*, the circuit court addressed whether meetings with White House staff, including the President, must be docketed on the EPA's rulemaking record. Recognizing "the basic need of the President and his White House staff to monitor the consistency of executive agency regulations with Administration policy," *id.* at 405, the court held that when not specifically required by statute, when due process concerns are absent, and when such communications do not contain "information or data," they need not be docketed in the rulemaking record. While *Costle* is not directly on point, it does suggest that the communications at issue here deserve sensitive and careful consideration.

On the basis of my *in camera* review, it is clear to me that the kind of internal pressure that may have been exercised within the Justice Department and the Corps of Engineers is nothing like the external pressure exerted in *Volpe.* It is to be expected that officials in the federal executive branch should coordinate their actions and attempt to take a uniform position, and I am neither shocked nor surprised that such efforts were made with regard to the Boston Harbor project.

While these communications certainly make interesting reading, they fall short of indicating the type of bad faith that would require expanding review beyond the administrative record.

In so ruling, I do not fashion any broad doctrine of intra-executive privilege. There may indeed be circumstances in which intra-executive communications show conclusively that an agency decision was based on irrelevant or improper considerations and in which such communications ought to be disclosed. I simply do not believe that those circumstances are present here.

Nor am I unmindful that these communications occurred. The *Costle* court, in declining to disclose intra-executive communications, noted, "After all, any rule issued here with or without White House assistance must have the requisite *factual support* in the rulemaking record." *Costle*, 657 F.2d at 407. Here, too, the Corps of Engineers' record of decision must be based in fact. The Killoy memos, which explain the factual basis for the Harris–Fox draft letter, are available for inspection as part of the administrative record. The court can examine the record already in existence to see if the Corps' final determination responded to the concerns that Killoy raised.

### III. *Attorney-client communications*

As to all but four of the documents produced by the U.S. Attorney, the defendants assert the attorney-client privilege. The privilege is asserted specifically with respect to all six letters between the U.S. Attorney and the Corps of Engineers, including the two letters that mention AUSA Henderson's opinion with regard to Killoy's application of the § 404 guidelines. Indeed, the attorney-client privilege protects these two documents from disclosure.

■ In order to establish the attorney-client privilege, the Corps must show that it was a client of the U.S. Attorney, that the U.S. Attorney was acting in its capacity as the Corps' attorney, that the communication was for the purpose of obtaining legal advice, and that the privilege was not waived. *United States v. Wilson*, 798 F.2d

**190**

509, 512 (1st Cir.1986) (citing *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950)).

 An attorney-client relationship exists between the Corps of Engineers and the U.S. Attorney in connection with anticipated litigation. *See* 28 U.S.C. §§ 516–519 (plenary authority of Attorney General and Department of Justice to conduct and direct litigation involving the United States or its agencies); *see also* 5 U.S.C. § 3106 (heads of executive and military departments to refer litigation to Justice Department). The letters reveal that the U.S. Attorney was acting as a lawyer and was engaged in giving the Corps legal advice with respect to reasonably anticipated litigation (that is, the instant case). All the letters begin with the heading, "ATTORNEY-CLIENT COMMUNICATION, PRIVILEGED AND CONFIDENTIAL," and there is no indication that these communications were disclosed to third parties. Based on my review of the two letters in question, I find that the attorney-client privilege applies.

The Towns may argue that it is unjust for the Corps of Engineers and the U.S. Attorney to be able to hide their improper communications under the cloak of attorney-client privilege. I therefore stress my finding above that the letters in question did not show evidence of bad faith or improper behavior. Rather, the two documents under consideration were candidates for discovery on the ground that the Corps may have considered them in reaching its permitting decision—that is, that they should have been included in the administrative record.

### IV. Conclusion

My review indicates that all but two of the documents in question are not properly part of the administrative record. The other two are shielded from discovery by the attorney-client privilege. Nor do any of the documents under review provide substantial evidence of bad faith. The best evidence to support the Towns' position in this litigation remains the two Killoy memoranda, which are already part of the ad-

ministrative record. This litigation will most certainly turn on whether the record of decision issued in connection with permit no. 199000033 adequately responds to the issues raised in those memoranda, and this is the issue to which the Towns should direct their abundant energies.

The motions for a protective order and to quash the subpoenas are hereby ALLOWED. The documents submitted to the court for inspection will be sealed and impounded should they be needed for appellate review.

SO ORDERED.