800 F.2d 822
 25 ERC 1048, 17 Envtl. L. Rep. 20,030
 FRIENDS OF THE EARTH; Federation of Western Outdoor Clubs;
Seattle Audubon Society; Northwest Steelhead and
Salmon Council; North Beach
Environmental Coalition, Inc.,
Plaintiffs/Appellants,
v.
Colonel Norman C. HINTZ, Seattle District Engineer, Corps of
Engineers; William R. Gianelli, Assistant Secretary for
Civil Works, Department of the Army; Corps of Engineers, a
department of the United States Army; and ITT- Rayonier,
Inc., Defendants/Appellees.
 No. 84-4176.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 3, 1985.
Decided Sept. 12, 1986.
 
 1
 Michael W. Gendler, Bricklin & Gendler, Seattle, Wash., for plaintiffs/appellants.
 
 
 2
 Linda McCorkle, Charles Goldmark, John W. Phillips, Seattle, Wash., F. Henry Habiaht, II, U.S. Dept. of Justice, Washington, D.C. for defendants/appellees.
 
 
 3
 Appeal from the United States District Court for the Western District of Washington, Tacoma Division.
 
 
 4
 Before REINHARDT and BEEZER, Circuit Judges, and COYLE,* District Judge.
 
 COYLE, District Judge:
 
 5
 On January 10, 1983, the Army Corps of Engineers issued a permit pursuant to Section 404 of the Clean Water Act, 33 U.S.C. section 1344, to appellee ITT Rayonier, Inc. ("Rayonier"). The permit authorizes Rayonier to fill a seventeen acre area as part of its sawmill/sorting yard/log export complex located in Grays Harbor on Washington's Pacific Coast within the City of Hoquiam. Appellants[1] appeal the district court's grant of summary judgment for appellees in which the court upheld the issuance of the permit. Jurisdiction is based upon 28 U.S.C. sections 1291 and 1331 and 33 U.S.C. section 1365. We affirm.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 6
 A. Facts.
 
 
 7
 In 1975 Rayonier purchased a seventeen acre tract in the "Bowerman Basin" mudflats area of Grays Harbor from the City of Hoquiam for use as a site for its Grays Harbor log export sorting yard. Bowerman Basin is a wetland, and a valuable habitat for numerous species of birds, as well as an important wintering and migratory spot for ducks, geese, and other waterfowl.
 
 
 8
 After obtaining a shoreline conditional use permit from the Washington State Department of Ecology, Rayonier began filling the seventeen acre tract in June 1978 so that it could be used for log export storage and sorting. At that time, a draft report of the Grays Harbor Estuary Management Plan designated the sorting yard area as outside a wetlands area for purposes of jurisdiction under section 404 of the Clean Water Act; hence, Rayonier neither applied for nor obtained a section 404 permit. Rayonier filled the tract with wood waste, which contains leachate, a highly toxic material.
 
 
 9
 In August, 1979, Rayonier's filling activities were reported to the Army Corps of Engineers ("Corps"), which prepared a memorandum noting that the fill of the tract might require a section 404 permit. Four months later, the Corps advised Rayonier that it had placed fill on wetlands adjacent to waters of the United States, without obtaining a Department of the Army permit in violation of federal law. On January 14, 1980, the Corps issued a cease and desist order to Rayonier requiring it to place no additional fill material on the wetlands at the Bowerman Basin site.
 
 
 10
 On March 25, 1980, the Corps requested resource agencies and others to submit their views regarding Rayonier's filling activities. The Corps received reports from the U.S. Fish and Wildlife Service ("FWS"), the National Marine Fisheries Service ("NMFS"), and the Environmental Protection Agency ("EPA"). The general consensus of these reports was that the fill would result in destruction of the wetlands and a recommendation that the Corps take appropriate legal action to have the fill removed. The Corps determined that because of changes in federal regulations relating to the definition of "wetlands" that had been adopted in July 1977,[2] Rayonier was required to obtain a section 404 permit but had failed to do so.
 
 
 11
 B. Administrative History.
 
 
 12
 The Corps regulations authorize the Corps to issue section 404 permits for activities initially undertaken without the required Department of the Army permit. See 33 C.F.R. Sec. 325 and former Sec. 326.5. Beginning in February 1981, the Corps and various resource agencies began to meet and discuss the possibility of a mitigation plan that would make such an after-the-fact permit for Rayonier acceptable.
 
 
 13
 On December 2, 1981, Rayonier informed the Corps that a mitigation plan had been reached. The mitigation plan contemplated the purchase by Rayonier of seventeen acres of pasture land ("Elk River site"), and the breaching of a dike to convert the pasture back into wetlands to offset the loss of a similar quantity of wetlands to Rayonier's filling.[3] Rayonier was to convey the Elk River site to the Washington Department of Game ("WDG"); however, the agreement did not require that Rayonier acquire the Elk River site as a prerequisite for the issuance of the section 404 permit. Rather, the agreement provided that Rayonier was to "pursue" purchase of the site. In the event that Rayonier did not purchase the site within six months, the mitigation plan only required Rayonier to pay a sum of $25,500 to the WDG. The absence of language in the mitigation agreement conditioning issuance of the permit upon Rayonier's conveyance of the Elk River site to the Washington Department of Game is one basis for this appeal.[4]
 
 
 14
 Meanwhile, Rayonier, acting at the request of the Corps, submitted a number of reports in May and June 1981 concerning its need for an export log storage and sorting area. The purpose of these reports was to determine whether Rayonier's use of the wetlands area for log storage was a "water dependant use" and whether feasible alternatives existed. See 33 C.F.R. Sec. 320.4(b)(4); 40 C.F.R. Sec. 230.10(a)(3). Rayonier argued in the reports that its "integrated" operation required a storage facility close to its dock operations, and that due to financial and logistical problems, no alternative sites existed. After several meetings with Rayonier, and requests for supplemental reports, the Corps collected and analyzed the views of the concerned agencies and Rayonier. On April 9, 1982 the Corps issued a Section 404(b)(1) evaluation and concluded that the sorting yard was a water dependant use and that no feasible alternatives existed.
 
 
 15
 Rayonier also submitted its formal leachate control plan to the Corps and to the Washington Department of Ecology in March, 1982. Rayonier proposed placement of a two-foot soil cap over the wood waste fill to prevent escape of leachate. The Corps determined that, despite Rayonier's proposals, leachate would continue to degrade the Bowerman Basin water quality for many years, but concluded that this plan would result in measureable improvement in quality of runoff from the site over the long term.
 
 
 16
 On August 20, 1982, the Corps requested that Rayonier submit a formal Section 404 permit application for the sorting yard pursuant to former 33 C.F.R. Sec. 326.5. On August 27, 1982 Rayonier submitted its Section 404 permit application. On September 28, 1982, the Corps provided public notice of its receipt of the application and intent to issue a section 404 permit to Rayonier. This public notice included the application, referenced the mitigation plan and attached Rayonier's water quality control plan. The notice stated requirements for compliance with the Endangered Species Act, Coastal Zone Management Act, and Clean Water Act, and invited public comment regarding the permit application.
 
 
 17
 The EPA, FWS, NMFS, and others responded to the public notice by stating that they neither supported nor opposed the permit provided that it was conditioned upon the mitigation agreement being made part of the permit application. The Washington Department of Ecology certified that the permit complied with the relevant provisions of the Federal Water Pollution Control Act, and stated that it had no objection to issuance of the Section 404 permit to Rayonier.
 
 
 18
 But Friends of the Earth objected to the issuance of the permit, and filed two letters arguing that: (1) the permit activity was not water dependent; (2) practicable alternatives existed, and (3) issuance of the permit would have an adverse effect on water quality. Friends of the Earth did not specifically object to the mitigation plan itself.
 
 
 19
 On December 21, 1982, the Corps issued an Environmental Assessment ("EA") of Rayonier's permit application. See 33 C.F.R. Sec. 230.9. The EA concluded that with the required mitigation, the permit would have "no significant impact on the human environment" and that, therefore, "no Environmental Impact Statement ("EIS") was needed". See 42 U.S.C. Sec. 4332.
 
 
 20
 On January 10, 1983, the Corps issued a Section 404 permit to Rayonier with a Statement of Findings. The Mitigation Agreement and Rayonier's water quality plan were made a special condition of the permit. At the time the Corps issued the permit, it sent a letter to the Friends of the Earth rejecting their objections as a basis for denying the permit and including copies of its Section 404(b)(1) evaluation, the EA, Statement of Findings, and the permit.
 
 
 21
 C. The District Court Proceedings.
 
 
 22
 Appellants filed suit in the United States District Court for the Western District of Washington on May 3, 1983 seeking judicial review of the Corps' issuance of the Section 404 permit to Rayonier. The District Court had jurisdiction under 28 U.S.C. Sec. 1331. In a six claim complaint, appellants alleged violations of Section 404 of the Clean Water Act, 33 U.S.C. Sec. 1344 (claim one); Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. Sec. 403 (claim two); Section 402 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. Sec. 1342 (claim three); Section 307 of the Coastal Zone Management Act of 1972, 16 U.S.C. Sec. 1456 (claim four); Section 102 of the National Environmental Policy Act ("NEPA") of 1969, 42 U.S.C. Sec. 4332 (claim five); and the Endangered Species Act, 16 U.S.C. Secs. 1531 and 1533 (claim six). The court, upon appellee's motion, dismissed claims two and four and Rayonier and the Corps filed answers to the remaining claims on July 8, 1983.
 
 
 23
 On April 19, 1984 Appellants scheduled the depositions of several defendants. Appellees moved to quash the depositions, contending that review was limited to the administrative record and discovery therefore was improper. The court granted defendant's motion, holding that "because judicial review of final agency action is limited to the administrative record, no discovery shall be had in this case." Appellants challenge this decision.
 
 
 24
 Also on April 19, 1984, Appellants moved for summary judgment on their fifth (NEPA) claim, and appellees moved for summary judgment on appellants' remaining claims. The court heard oral argument on the motions on June 1, 1984, at which time it requested supplemental memoranda and proposed orders in the form of findings and conclusions. On July 23, 1984, the Corps supplemented the Administrative Record with documents establishing that Rayonier completed its responsibilities under the mitigation agreement by purchasing and conveying the Elk River site to the Washington Department of Game on August 31, 1983.
 
 
 25
 On August 21, 1984, the district court entered an order granting appellee's motion for summary judgment and denying that of the appellants. The court held:
 
 
 26
 Judicial review of the Corps' decision is limited to the administrative record. (Conclusion of Law No. 3)
 
 
 27
 * * *
 
 
 28
 The Corps of Engineers' decision to grant Rayonier's Section 404 permit was rationally based on a reviewable administrative record. (Finding of Fact No. 21)
 
 
 29
 * * *
 
 
 30
 The Corps' decision to grant Rayonier's Section 404 permit is not found by this Court to have been 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'
 
 
 31
 (Conclusion of Law No. 4)
 
 
 32
 * * *
 
 
 33
 The Corps of Engineers reasonably concluded, based on a reviewable administrative record, that issuance of the permit requested by Rayonier, in accordance with the mitigation agreement that was a special condition of the permit, would not significantly affect that quality of the human environment and that preparation of a formal EIS was therefore unnecessary. (Finding of Fact No. 22)
 
 
 34
 * * *
 
 
 35
 Plaintiffs have waived their Fifth and Sixth Claims, under the NEPA, 42 U.S.C. Sec. 4332, and the Endangered Species Act, 16 U.S.C. Sec. 1531, et seq. (Conclusion of law No. 5)
 
 
 36
 On September 19, Appellants filed their notice of appeal.[5] Appellants will seek attorneys' fees for appeal if successful. 33 U.S.C. Sec. 1365; 28 U.S.C. Sec. 2412; Ninth Circuit Local Rule 13(b)(1)(E).
 
 II.
 DISCUSSION
 
 37
 Appellants' appeal of the district court's summary judgment challenges the issuance of the section 404 permit to Rayonier and the Corps' decision not to require an EIS pursuant to 42 U.S.C. Sec. 4332 (NEPA) for the fill. Further, appellants appeal the district court's decision to limit judicial review to the administrative record.
 
 
 38
 Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is clearly entitled to prevail as a matter of law. Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 677 (9th Cir.1984). On an appeal from a summary judgment, the reviewing court must "look at the record on summary judgment in the light most favorable to ... the party opposing the motion." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).
 
 
 39
 A. Limitation of Judicial Review to the Administrative Record.
 
 
 40
 Appellants argue that the district court's decision that review of the Corps' determinations was limited to the administrative record was incorrect. Appellants argued this point in opposition to appellee's motion to quash deposition notices. They now contend that the court's order deprived them of the opportunity not only to discover matters of a factual nature, but also to determine whether the administrative record was a complete and accurate record of the Corps' deliberations.
 
 
 41
 With a few exceptions, discussed below, judicial review of agency action is limited to a review of the administrative record. In Florida Power & Light Co. v. Lorion, 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985), the Supreme Court noted that"[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 [93 S.Ct. 1241, 1244, 36 L.Ed.2d 106] (1973). The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. Sec. 706, to the agency decision based on the record the agency presents to the reviewing court. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
 
 
 42
 Id. at ----, 105 S.Ct. at 1607. See also Black Construction Corp. v. INS, 746 F.2d 503, 505 (9th Cir.1984); Arizona Past & Future Foundation, Inc. v. Lewis, 722 F.2d 1423, 1425-26 (9th Cir.1983). Courts apply this same standard for reviewing agency action under Section 404 and NEPA. See, e.g., Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 905 (5th Cir.1983) (basis for court's review of a section 404 permit decision is the administrative record); Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d 678, 684 (D.C.Cir.1982) (Review of agency's decision not to issue EIS confined to administrative record).
 
 
 43
 But exceptions exist to the rule that review of agency action is limited to the administrative record. A court may consider evidence outside the administrative record as necessary to explain agency action. Asarco, Inc. v. United States Environmental Protection Agency, 616 F.2d 1153, 1159 (9th Cir.1980). See also Arizona Past & Future Foundation v. Lewis, 722 F.2d at 1426 n. 5. When there is "such a failure to explain administrative action as to frustrate effective judicial review," the court may "obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary." Public Power Council v. Johnson, 674 F.2d 791, 793-94 (9th Cir.1982), quoting, Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973) (per curiam). The purpose of the court's enquiry should be to ascertain whether the agency considered all relevant factors or fully explicated its course of conduct or grounds of decision. Asarco, Inc. v. United States Environmental Protection Agency, 616 F.2d at 1160.
 
 
 44
 We believe that the 639 page administrative record adequately explains the Corps' decision and shows that the Corps weighed the relevant factors before issuing the section 404 permit. The discovery sought by the appellants[6] might have supplied a fuller record, but otherwise does not address issues not already there. No further "background information" was necessary for the court to review the record. The court below properly limited review to the administrative record.
 
 
 45
 B. The Corps' Issuance of a Section 404 Permit.
 
 
 46
 The district court's summary judgment upheld the Corps' decision to issue a section 404 permit to Rayonier to discharge fill material into a wetlands area. Section 404 of the Clean Water Act, 33 U.S.C. section 1344(a) authorizes the Army Corps of Engineers to issue permits allowing the discharge of dredged or fill material. See also 33 C.F.R. Sec. 320.3(f). The Section 404 permit process is governed simultaneously by Corps Regulations, 33 C.F.R. Parts 320-29, and by EPA guidelines, 40 C.F.R. Part 230. Both sets of rules must be observed. See 33 C.F.R. Secs. 320.3(f), 320.4(a)(1).
 
 
 47
 Section 320.4 of 33 C.F.R. sets forth the general policies that are to guide the Corps in its evaluation of permit applications for fill activities. The regulations require the Corps to conduct a public interest review, balancing the "benefit which reasonably may be expected to accrue from the proposal" against its "reasonably foreseeable detriments" with consideration for the "national concern for both the protection and utilization of important resources."[7] 33 C.F.R. Sec. 320.4(a)(1). A permit will be granted unless the district engineer determines that issuance would be contrary to the public interest. Id. However, a section 404 permit must also comply with EPA guidelines. Id.
 
 
 48
 Corps policies relating specifically to wetlands are found in 33 C.F.R. section 320.4(b). That section declares that
 
 
 49
 Some wetlands are vital areas that constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest.
 
 
 50
 33 C.F.R. Sec. 320.4(b)(1). This provision then identifies seven types of functions performed by wetlands that are important to the public interest, 33 C.F.R. section 320.4(b)(2), and states that "[n]o permit will be granted which involves the alteration of wetlands" unless the Corps engages in a public interest review and concludes that "the benefits of the proposed alteration outweigh the damage to the wetlands resource." 33 C.F.R. Sec. 320.4(b)(4).
 
 
 51
 The pertinent EPA guidelines reflect the policy that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact...." 40 C.F.R. Sec. 230.1(c). The EPA guidelines parallel the Corps' regulations in their special concern for wetlands. Thus, the guidelines state:
 
 
 52
 From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources.
 
 
 53
 40 C.F.R. Sec. 230.1(d).
 
 
 54
 1. Standard of Review.
 
 
 55
 The standard of review for an agency determination to issue a section 404 permit is that found in the Administrative Procedures Act, 5 U.S.C. section 706(2), which provides that the reviewing court shall set aside any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 904 (5th Cir.1983); Sierra Club v. United States Army Corps of Engineers, 701 F.2d 1011, 1032 (2d Cir.1983).
 
 
 56
 This standard of review is highly deferential. While the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and while "this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.[8] Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1027 (9th Cir.1980).
 
 
 57
 2. Application.
 
 
 58
 Appellants claim that the Corps acted arbitrarily and capriciously in granting a section 404 permit to Rayonier. Appellants raise three specific objections to the Corps' decision to grant the permit: (1) the permit activity is not water dependent; (2) practicable alternatives to the permit area existed, and (3) the permit activity would have an adverse effect on water quality. Appellants also argue that in reaching its conclusions, the Corps erroneously relied on information supplied by Rayonier, and failed to conduct its own investigation or independently verify the information on which it based its decision.
 
 
 59
 (a) Water Dependency.
 
 
 60
 The Regulations define a water dependent activity as one requiring "access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose." 40 C.F.R. 230.10(a)(3). If an activity is found not to be water dependent, then "practicable alternatives that do not involve special aquatic sites are presumed to be available...." Id. In its Section 404(b) evaluation of Rayonier's permit application, the Corps determined that Rayonier's log storage activity was water dependent. Appellants challenge this conclusion.[9]
 
 
 61
 The record reflects, however, that the Corps engaged in a reasonably thorough examination of the water dependency issue, and reached a rational conclusion. The Corps first requested information from Rayonier regarding the fill activity in March 1981. Rayonier met with representatives of the Corps and other state and federal resource agencies to discuss a section 404(b) evaluation in May 1981, and reached the following conclusion regarding water dependency:
 
 
 62
 All agencies agreed that log storage is not a water dependent use unless the storage is tied to an exporting facility. The agencies do recognize the need for an inventory of logs immediately adjacent to the ship loading facility and would consider log storage for this purpose as water dependent.
 
 
 63
 The participants then requested supplemental information from Rayonier on the water dependency issue, and specifically called for details on four matters.
 
 
 64
 Rayonier prepared the requested report in which it concluded:
 
 
 65
 The sawmill, sorting yard and export log storage functions together form an integrated complex. The sorting area acts as a receiving point. It serves the sawmill as well as the export log storage area. In addition, it handles logs to be shipped to local domestic users.... From this base expanding export log storage to [the permit area] is the only feasible alternative. In this context, then the filling of [the permit area] is water dependent.
 
 
 66
 In other words, Rayonier's Grays Harbor facility is an integrated complex so that the log storage area is used both for domestic and export purposes. Accordingly, the storage area must be adjacent to the shiploading facility, and therefore is a water dependent activity.
 
 
 67
 The Corps then met with the other resource agencies on May 27, 1981 to discuss and analyze this report. Rayonier was asked to prepare report revisions, which it submitted on June 22, 1981. Rayonier also provided answers to specific questions asked by the Corps and the concerned resource agencies. The Corps and each of the agencies then analyzed and reviewed Rayonier's report, and concluded that the proposed activity was water dependent. The Corps' section 404(b) evaluation explicitly responded to appellants' assertion that the fill activity was non-water related, and explains the reasoning for their decision:
 
 
 68
 Applicants Response. Log storage is an important part of the overseas lumber and log export facility. Log storage near the dock is essential to the efficient operation of that facility.
 
 
 69
 District Engineer's View. The applicant's log and lumber export operations require immediate proximity to navigable waters. The project site will serve as a log storage area for these operations. The expansion of the applicant's industrial complex, to include the project site, constitutes a water-dependent use of a special aquatic area.
 
 
 70
 This record does not support Appellants' claim that "the record does not explain the Corps' sudden disavowal of the previous consensus among it and the resources agencies."[10] Appellants' Brief, page 34. Rather, the record reveals that after a substantial exchange of information, the agencies agreed with Rayonier that its log storage activity was related to export, and hence, by their own definition, a water dependent activity. The record adequately explains why the Corps believed the fill activity was water dependent, and that explanation is rational. See Sierra Club v. United States Army Corps of Engineers, 772 F.2d 1043, 1051 (2d Cir.1985).
 
 
 71
 (b) Practicable Alternatives.
 
 
 72
 The EPA guidelines require that the Corps issue no section 404 permit for discharge of fill material onto wetlands if "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. Sec. 230.10(a).[11] The guidelines define "practicable" in 40 C.F.R. section 230.10(a)(2):
 
 
 73
 (2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.
 
 
 74
 In its section 404(b) evaluation, the Corps concluded that "no practicable alternative site locations exist would satisfy [Rayonier's] logistical needs and are not prohibitively expensive." Appellants challenge that determination on the grounds that the Corps improperly limited its consideration of alternative sites for log storage to those sites reviewed and eliminated by Rayonier, and that the information supplied by Rayonier confirmed that practicable alternatives were available.
 
 
 75
 In its May 21, 1981 report to the Corps, Rayonier listed four possible alternative sites for its sorting yard--Port of Grays Harbor Kaiser site, Port of Grays Harbor terminal 4, adjacent property owned by the City of Hoquian, and two tracts of land north of the sawmill site. Rayonier argued that due to distance only the Port of Grays Harbor Kaiser site and the Port of Grays Harbor Terminal 4 were practicable. Rayonier noted, however, that either of these facilities would mean substantial additional costs ($1,785,700 per year for Terminal 4; approximately $1,000,000 per year for the Kaiser site) from double handling, service fees, storage, overhead and inefficiency.
 
 
 76
 The Corps and the other concerned state and federal resource agencies then considered and evaluated Rayonier's report. At a meeting on May 27, 1981, Rayonier and the agencies discussed logistics and costs of utilizing a remote site for storage of export logs. Rayonier was directed to supplement its report to address those concerns. Rayonier responded in its June 22, 1981 supplemental report.
 
 
 77
 After considering Rayonier's report of June 22, 1981, and the conclusions of the concerned agencies, the Corps produced its section 404(b) evaluation. Referencing Rayonier's report, the Corps concluded that no practicable alternatives existed. The Corps also addressed appellants' proposed alternative--that Rayonier remove all fill material. The Corps found that suggestion punitive inasmuch as Rayonier's need was legitimate, and concluded that "from a resource management perspective, allowing completion of the fill so long as acceptable mitigation could be identified and implemented was the more logical and practical approach."
 
 
 78
 Thus, the record reflects that the Corps made the proper analysis and weighed the correct factors in making its determination that no feasible alternatives existed. The Corps did not err by taking Rayonier's costs into account. The regulations explicitly charge the Corps with taking cost, existing technology and logistics in light of overall project purposes. 40 C.F.R. Sec. 230.10(a)(2). In Louisiana Wildlife Federation, Inc. v. York, 603 F.Supp. 518 (W.D.La.1984), aff'd in part and vacated in part, 761 F.2d 1044 (5th Cir.1985), the court rejected the argument that the Corps must consider alternatives solely in terms of environmental impact, rather "it must take into account the objectives of the applicant's project." Id. at 528.
 
 
 79
 Of the four proposed alternative sites, the Corps rationally concluded that the two were too costly for the applicant, and two were logistically unfeasible in light of Rayonier's legitimate purposes. While an argument can be made that one of these sites was suitable, it would not be appropriate for us to overturn the Corps' contrary finding. The Corps complied with its "duty under the law," see Save Our Wetlands, Inc. v. Sands, 711 F.2d 634, 646 (5th Cir.), reh'g denied, 718 F.2d 1096 (1983) and its decision is not subject to reversal.
 
 
 80
 (c) Effect on Water Quality.
 
 
 81
 The Corps' regulations require it to evaluate permit applications for activities which may affect the quality of water for compliance with applicable affluent limitations and water quality standards. 33 C.F.R. Sec. 320.4(d). Appellants argue that by issuing the section 404 permit to Rayonier, the Corps abandoned its initial recognition that toxic leachate from the wood waste fill is unacceptable.
 
 
 82
 On November 12, 1982, the Washington Department of Ecology certified that Rayonier's fill activity complied with the water quality standards set by the Clean Water Act. AR 562. See also 33 U.S.C. Sec. 1341. Under the Corps' regulations, such certification is conclusive with respect to water quality considerations. 33 C.F.R. Sec. 320.4(d). Appellants did not challenge the Washington Department of Ecology's certification, or the conclusive effect of this regulation, in any proceeding below. Accordingly, Appellants are foreclosed from raising the water quality issue with respect to Rayonier's section 404 permit.
 
 
 83
 3. Procedural Errors.
 
 
 84
 Appellants argue that the Corps' determination to issue Rayonier the section 404 permit was improper because by doing so the Corps changed its position on the effects of the fill activity. Initially, in 1979, when the Corps found out that Rayonier was filling the permit area with wood waste, the Corps and other resource agencies stated that the fill material was not for a water dependent purpose, that extensive filling in Grays Harbor was a widespread problem resulting in cumulative destruction of wetlands, and that protection of wetlands and water quality is definitely in the public interest.
 
 
 85
 When the Corps issued Rayonier a section 404 permit, so appellants' argument goes, it reversed its position on all these findings, thereby implying that its decision was arbitrary and capricious. This argument makes little sense. The Corps' ultimate decision was not a reversal but simply the culmination of over a year and a half of investigations, meetings, and reports. All the documents relied upon by Appellants were issued before the Corps considered the reports offered by Rayonier and the effects of the mitigation plan and indeed, some of these documents were not issued by the Corps at all. Certainly, the Corps' initial comments were preliminary and subject to change as understanding of permit issues expanded, the factual record developed, and the mitigation plan created. Appellants' logic would tether the Corps to impressions made prior to any study of the potential impact of the fill activity, and actually deter the Corps from seeking to resolve difficult environmental questions.
 
 
 86
 Appellants' other ground for procedural impropriety is that the Corps did not do its own fact-finding and evaluation but relied solely upon information supplied by Rayonier. Appellants argue that both NEPA and the Clean Water Act impose upon federal agencies a duty to gather their own information and to review independently information supplied by a permit applicant. Here, appellants contend that the Corps erred by basing its permit decision exclusively on Rayonier's justification report.
 
 
 87
 The Corps' regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an EA. See Save the Bay, Inc. v. U.S. Army Corps of Engineers, 610 F.2d 322, 325 (5th Cir.), cert. denied, 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980). An EA may be based entirely upon information supplied by the applicant and indeed may be prepared by an outside consulting firm.[12] 33 C.F.R. Part 230, App. B Sec. 8(b). See also Save Our Wetlands, Inc. v. Sands, 711 F.2d at 642-643. But the Corps' regulations do say that when information for an EA is prepared by the applicant, "the district engineer is responsible for independent verification and use of the data, evaluation of the environmental issues, and for the scope and content of the EA." 33 C.F.R. Part 230, App. B Sec. 8(b). See also 40 C.F.R. Sec. 1506.5(b). Thus, while the Corps could, and did, base its permit decision exclusively on the information provided by Rayonier, the Corps nonetheless had an obligation to independently verify the information supplied to it.
 
 
 88
 Appellants' contention must be analyzed in light of its specific objections to the issuance of the section 404 permit. As to effect on water quality, we held above that verification by the Washington Department of Ecology that Rayonier's fill activity complied with the Water standards set by the Clean Water Act foreclosed Appellants from attacking the Corps approved leachate control plan here. With respect to the verification procedures used by the Corps, we find no basis for any claim of error although in view of the factual record any error would be, in any event, harmless. As to its determination of water dependency, the Corps requested reports and supplemental reports from Rayonier, consulted various federal and state resource agencies, analyzed the information, asked Rayonier questions, requested yet additional report revisions, and rationally concluded that the fill activity was water dependent. The evidence in the record that the Corps reviewed, analyzed, and supplemented Rayonier's report is sufficient to fulfill its obligation under federal regulations. Cf. Save Our Wetlands, Inc. v. Sands, 711 F.2d at 643.
 
 
 89
 Appellants' assertion that the Corps did not meet its duty to independently verify is most vehemently directed, however, to the Corps' alleged failure to independently investigate alternative feasible sites for the log export facility. Under the regulations then in force, see supra, n. 12, Rayonier had the burden of providing data regarding alternative sites. Rayonier made a study of four alternative sites and found none suitable. The Corps, as well as the EPA, FWS and WDG evaluated this report, proffered questions, and only after requesting supplemental reports concurred with Rayonier that no practicable alternatives existed. The Corps was not required to conduct a further study of alternatives or to independently find possible sites overlooked by Rayonier. See River Road Alliance, Inc. v. Army Corps of Engineers, 764 F.2d 445, 453 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986). The Corps is not a business consulting firm, "[i]t is in no position to conduct a feasibility study of alternative sites" in Grays Harbor for a log export facility, "a study that would have to both evaluate [Rayonier's] business needs and determine the availability of the necessary permissions from the owners of ... land at various sites." Id. The Corps had to depend primarily on Rayonier for such information, and exhaustively studied that information prior to making its decision, a decision which, we emphasize, is supported by the conclusions of the concerned resource agencies.[13]
 
 
 90
 We conclude that the Corps satisfied its duties under the regulations; to require anything further would place unreasonable and unsuitable responsibilities on the Corps, which receives over 14,000 permit applications per year. See id. at 449. Certainly, we would not condone blind acceptance by the Corps of Rayonier's or any other applicant's study of alternative sites. But the record does not show, as appellants contend, that the Corps uncritically accepted Rayonier's assertions. The Corps justifiably and legally relied primarily upon the study prepared by Rayonier, and its review of that study satisfied regulatory requirements. Further, the Corps sought and obtained the expert views of the resource agencies involved. The role appellants cast for the Corps is neither reasonable in terms of the Corps' resources nor mandated by the regulations.
 
 
 91
 The ample record shows that the Corps' decision to issue Rayonier a section 404 permit was not arbitrary and capricious, but was based upon substantial information accompanied by nearly a year of meetings, reports, and evaluations. The Corps' review process was not "woefully inadequate," nor was its decision based on so little information that "it could only be explained as resulting from an almost fixed predetermination to grant the ... permit." Sierra Club v. United States Army Corps of Engineers, 701 F.2d at 1032.
 
 
 92
 C. NEPA Claim.
 
 
 93
 The purpose of NEPA is to assure that federal agencies are fully aware of the impact of their decisions on the environment. Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 985 (9th Cir.1985). Thus, NEPA requires all federal agencies to prepare an EIS for major federal actions "significantly affecting the quality of the human environment...." 42 U.S.C. Sec. 4332(2)(C). The regulations define federal action as including "actions approved by permit or other regulatory decision," 40 C.F.R. Sec. 1508.18(b)(4), thereby making Rayonier's fill of the subject wetlands a federal action. An EIS must be prepared when substantial questions are raised on whether a project may significantly degrade the human environment. Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d at 986; Foundation for North American Wild Sheep v. United States Department of Agriculture, 681 F.2d 1172, 1178 (9th Cir.1982). However, courts permit the effect of mitigation measures to be considered in determining whether preparation of an EIS is necessary. Jones v. Gordon, 792 F.2d 821, 829 (9th Cir.1986); Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d at 987.
 
 
 94
 In its EA issued December 21, 1982, the Corps determined that with the mitigation agreement, see supra, n. 3, Rayonier's permit activity would have no significant impact on the human environment and therefore no EIS was necessary. Appellants challenge the Corps' decision not to issue an EIS on the ground that the mitigation agreement imposed no mandatory duties on Rayonier other than payment of a sum of money to the WDG. Payment of money, appellants contend, is a form of mitigation inadequate to relieve the Corps of its obligation to prepare an EIS. The district court rejected appellants' NEPA claims both because they waived those claims and because the Corps reasonably concluded that an EIS was not necessary for Rayonier's permit activity. Additionally, appellees argue that the NEPA issue is moot.
 
 
 95
 An agency's decision that a particular project does not require preparation of an EIS is to be upheld unless it is unreasonable.[14] Jones v. Gordon, 792 F.2d at 827; Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d at 987; The Steamboaters v. FERC, 759 F.2d 1382, 1392 (9th Cir), reh'g denied, 777 F.2d 1384 (1985).
 
 
 96
 The mitigation agreement required Rayonier to pursue the purchase of seventeen acres of pasture land (the Elk River Site) and transfer title thereto to the WDG. The pasture lands, also part of the Grays Harbor area, then would be converted back into wetlands in order to offset the loss of wetlands caused by Rayonier's fill activity. However, the agreement did not condition issuance of the section 404 permit upon the purchase of the mitigation lands and their conversion to wetlands. Rather, if Rayonier did not purchase the Elk River site within six months, the agreement only obligated it to pay $25,500 to the WDG; and, if after 3 1/2 years the mitigation lands remained unpurchased, the agreement required Rayonier to pay $32,122.66 to WDG. The WDG would hold the money for purchase of the Elk River site, or a comparable site when one became available for purchase. Thus, appellants contend that the only mitigation actually imposed by the agreement was payment of a "modest" amount of money which cannot mitigate the loss of valuable wetlands sufficiently to excuse preparation of an EIS.
 
 
 97
 But ultimately, Rayonier did purchase the Elk River site and conveyed it to the WDG on August 31, 1983. After the purchase and conveyance, representatives of the WDG, EPA, and FWS signed off Rayonier's duties under the mitigation agreement as complete. Because Rayonier has completed purchase and conveyance of the mitigation lands, appellants' fear that the mitigation plan would result merely in payment of money, with no provision for alternative wetlands no longer raises a live controversy amenable to judicial resolution. Thus, we hold that appellants' argument based on the contingent nature of the mitigation agreement is moot.
 
 
 98
 Appellants' claims based on the mitigation agreement are necessarily limited, therefore, to whether the Elk River site adequately mitigates Rayonier's fill activity so as to excuse preparation of an EIS.[15] In this regard, appellants apparently offer a strictly legal argument that the mitigation agreement is insufficient because the regulations do not allow an EIS to be excused by mitigation accomplished "off-site."[16] We disagree, and answer that narrow question by holding that mitigation relating to a different parcel of land than that directly affected by a project may under appropriate circumstances constitute mitigation that serves to relieve the Corps of the obligation of preparing an EIS.
 
 
 99
 The regulations explicitly allow off-site mitigation:
 
 
 100
 Such conditions may be accomplished on-site, or may be accomplished off-site for mitigation of significant losses which are specifically identifiable, reasonably likely to occur, and of importance to the human or aquatic environment.
 
 
 101
 33 C.F.R. Sec. 325.4(a)(3). Further, the CEQ regulations define mitigation as including "compensat[ion] for the impact by replacing or providing substitute resources or environments." 40 C.F.R. Sec. 1508.20(e) (emphasis added). The regulations do not indicate, however, whether such off-site mitigation can relieve the Corps of preparing an EIS. Yet, neither do the regulations automatically require preparation of an EIS when mitigation is provided off-site. The regulations require that an EIS be prepared for all civil works activities "when the proposed action is expected to have significant effect upon the quality of the human environment," 33 C.F.R. Sec. 230.11, and mitigation measures may be considered in determining whether preparation of an EIS is necessary. Considering the regulations' explicit approval of off-site mitigation, we see no reason why off-site mitigation cannot be considered in determining whether to prepare an EIS, just as on-site mitigation.
 
 
 102
 Accordingly, the Corps was entitled to consider the impact of the substitute wetlands envisioned by the mitigation plan in determining whether the permit activity required an EIS. The Corps concluded that with the mitigation here involved, no EIS was necessary. Appellants do not specifically attack the adequacy of the Elk River site, therefore we must conclude that the Corps' decision not to prepare an EIS was reasonable.[17] Our holding obviates discussion of appellee's argument that appellants have waived their NEPA claim.
 
 III.
 CONCLUSION
 
 103
 We conclude that the district court properly limited its review of the Corps' decision to the administrative record, that the Corps' decision to issue Rayonier a section 404 permit was not arbitrary and capricious, and that the Corps' decision not to prepare an EIS was reasonable. Accordingly, we affirm the decision of the district court.
 
 
 104
 AFFIRMED.
 
 
 
 *
 Robert E. Coyle, United States District Judge, Eastern District of California, sitting by designation
 
 
 [1]
 Appellants are various environmental groups and when referred to collectively are called "Appellants."
 
 
 [2]
 In 1977, the Corps' regulations changed pursuant to the court's order in Natural Resources Defense Council, Inc. v. Callaway, 392 F.Supp. 685 (D.D.C.1975), in which the court held that Section 404 jurisdiction extended to cover all navigable waters of the United States
 
 
 [3]
 The mitigation agreement, incorporated into Rayonier's Section 404 permit, reads:
 
 
 [1]
 ITT Rayonier, Inc., (ITT) and a resource agency committee (representatives of the US Environmental Protection Agency; US Department of the Interior, Fish and Wildlife Service; US Army Corps of Engineers; and the Washington Department of Game (WDG)), representing the State of Washington, have agreed that land mitigation for ITT's unauthorized fill in Bowerman Basin, Grays Harbor, should involve purchase of a portion of a 66-acre property located at the Elk River in South Bay, Grays Harbor. This Elk River site is predominately high salt-marsh that was converted to pastureland by placement of a dike and tide gates. The terms of the mitigation agreement are described below. Issuance of a Department of the Army permit shall initiate the timing of the agreement terms
 
 
 [2]
 ITT will pursue the purchase of 17.0 acres of Elk River site and will transfer the title of this land to WDG
 
 
 [3]
 If the land purchase has not been accomplished within 6 months of the date of the Department of the Army permit, ITT agrees to make available to the WDG (within 30 days written notice) the total sum of $25,500 for the purpose of purchasing 17.0 acres of the Elk River site. These funds will be held by ITT and will be available to WDG for up to an additional 3 years. ITT agrees to increase the total sum by 8 percent per year (compounded annually) as long as the funds are in their possession. Funds not required for purchase of the 17.0 acres at the Elk River site will be retained by ITT. WDG may request and use the funds for purchase of mitigation land in Grays Harbor other than the Elk River site subject to approval by ITT
 
 
 [4]
 If the mitigation lands have not been purchased after 3.5 years (6 months plus 3 years per above terms), ITT agrees to transfer a total sum of $32,122.66 to WDG. WDG agrees to use these funds for purchase and preservation of coastal wetlands in Grays Harbor
 
 
 [4]
 Several agencies expressed similar concern over the mitigation agreement. The National Marine Fisheries Services recommended that the permit be conditioned to require consummation of the property title transfer. The Environmental Protection Agency concurred, stating:
 Although EPA supports this Agreement, we understand that ITT intends to purchase the 17 acres of wetlands only upon issuance of the permit. The current public notice does not identify a mechanism to assure the purchase or reimbursement of funds to the WDG should the land purchase fail. The issued permit should therefore contain a provision to assure compliance with the mitigation agreement.
 The U.S. Fish and Wildlife Service also suggested that the permit for this project be conditioned to require the proposed mitigation.
 
 
 [5]
 Appellants do not appeal the court's summary judgment on claim six, brought under the Endangered Species Act, 16 U.S.C. Secs. 1531 and 1533
 After entry of judgment, Rayonier moved for an award of attorneys' fees. The court denied the motion, which order Rayonier does not appeal.
 
 
 [6]
 Appellants sought to depose Corps decisionmakers to determine whether the Corps "independently reviewed data submitted by Rayonier," and to find out:
 What was the 'other pertinent information' cited by the Corps in addition to Rayonier's June 22, 1981 report (AR 594)? Did the Corps review the leachate study cited by Rayonier in its Statements of Findings, but which is not in the record (AR 584)? Did the Corps consider Dr. Herman's study regarding the spring migration shorebird use of Grays Harbor, which was funded by and submitted to the Corps but again was not part of the record (CR 39, Ex. A)? Why did the Corps issue a permit without following through on its previous requests for a leachate control study (AR 263), for implementation of a water quality monitoring program (AR 590), and implementation of the mitigation plan prior to issuance of the permit (AR 521)?
 Appellants' Brief, page 39. Here, the only apparent justification for this discovery might be to assist the court in determining whether the Corps independently reviewed the data supplied by Rayonier. As stated below, we believe the present record discloses that the Corps met its obligation to independently verify.
 
 
 [7]
 33 C.F.R. Sec. 320.4(a)(1) provides:
 (a) Public interest review. (1) The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impacts which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so the conditions under which it will be allowed to occur, are therefore determined by the outcome of the general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof. Among those are conservation, economics, aesthetics, general environmental concerns, wetlands, cultural values, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership, and, in general, the needs and welfare of the people. For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines. Subject to the preceding sentence and any other applicable guidelines or criteria (see Secs. 320.2 and 320.3), a permit will be granted unless the district engineer determines that it would be contrary to the public interest.
 
 
 [8]
 Appellants argue that "heightened" review is appropriate here because "[t]he record makes clear that the Corps ... changed its mind on all of these points and decided to issue a Sec. 404 permit." Appellants' Brief, page 27. But all four cases relied upon by Appellants permitted heightened review only when an administrative agency specifically reversed a formal prior decision or regulation. See Baltimore & Annapolis R.R. Co. v. Washington Metropolitan Area Transit Commission, 642 F.2d 1365, 1370 (D.C.Cir.1980) (agency must justify departure from a twelve year old order regarding jurisdiction); Montana Power Co. v. EPA, 608 F.2d 334, 348 n. 27 (9th Cir.1979) (EPA's deviation from prior decision not subject to heightened scrutiny because not deviation from "long established practice"); ASG Industries, Inc. v. United States, 548 F.2d 147, 154 (6th Cir.1977) (higher showing required when agency adopts findings of fact of administrative law judge but reverses conclusions of law); Columbia Broadcasting System, Inc. v. FCC, 454 F.2d 1018, 1026 (D.C.Cir.1971) (agency must explain modification of established precedent). That is not the case here--the "decisions" reversed by the Corps were not long-standing policy or even formal decisions--but initial conclusions at the outset of a long administrative investigation
 
 
 [9]
 Also, some courts have held that a finding of water dependency is not a prerequisite to issuance of a section 404 permit, but only a factor to consider in the application process. See 1902 Atlantic Ltd. v. Hudson, 574 F.Supp. 1381, 1398 (E.D.Va.1983). Cf. Louisiana Wildlife Federation v. York, 761 F.2d 1044, 1047 (5th Cir.1985) (non-water dependent activity necessitates a more persuasive showing than otherwise). Under this rationale, if the Corps incorrectly determined that Rayonier's fill activity was non-water dependent, reversal of the summary judgment would not be automatic
 
 
 [10]
 Appellants attack the "integrated complex" rationale as an attempt to "bootstrap" all activities at Rayonier's sorting yard onto the water dependency of the loading dock, and intentionally inconsistent. Appellants' Brief, page 34. But it is clear, and Appellants' apparently do not dispute, that storage of logs for export is most efficiently done near the docksite. Storage of logs for domestic use is not water dependent, but efficiency dictates that the storage function not be divided, because logs are not initially segregated between domestic and export. The Corps' decision, therefore, is neither irrational nor contradictory
 
 
 [11]
 40 C.F.R. Sec. 230.10(a)(1) further provides:
 (1) For the purpose of this requirement, practicable alternatives include, but are not limited to:
 (i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;
 (ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters....
 
 
 [12]
 The regulations in force at the time of the issuance of the permit placed the burden on the applicant to supply information regarding water dependency and the feasibility of alternative sites:
 The applicant must provide sufficient information on the need to locate the proposed activity in the wetland and must provide data on the basis of which the availability of feasible alternative site can be evaluated.
 
 
 [33]
 C.F.R. Sec. 320.4(b)(4) (1983)
 
 
 [13]
 For example, the EPA concurred with Rayonier's June 22, 1981 report which concluded that no practicable alternative to the fill site existed
 
 
 [14]
 Appellants argue that closer scrutiny of the district court's ruling is required because the lower court adopted the order proposed by appellees verbatim. Although the district court's findings of fact and conclusions of law draws heavily upon that submitted by appellees, the two are not the same. The portions dealing with the NEPA claims are significantly different. Further, even if the two were identical, we do not see that that would require heightened review. Certainly the authority cited by appellant does not stand for that proposition. See Rickards v. Canine Eye Registration Foundation, Inc., 704 F.2d 1449, 1453 (9th Cir.), cert. denied, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983), (fact that magistrate adopts findings prepared by the prevailing party does not necessitate de novo review)
 
 
 [15]
 Appellants also object to the agreement on the ground that it was not part of the original proposal and was not imposed by statute or regulation. Appellants rely on the Council on Environmental Quality ("CEQ") document called the "40 Questions" in support of this proposition:
 Mitigation measures may be relied upon to make a finding of no significant impact only if they are imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal. As a general rule, the regulations contemplate that agencies should not rely on the possibility of mitigation as an excuse to avoid the EIS requirement.
 
 
 [46]
 Fed.Reg. 18,026, 18,038 (1981) (40 Questions Document). But, appellants' reliance on this document is misplaced because courts uniformly have held that the CEQ forty questions document is not a regulation, but merely an informal statement and is not controlling authority. See State of Louisiana v. Lee, 758 F.2d 1081, 1083 (5th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1259, 88 L.Ed.2d 570 (1986); Cabinet Mountain Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d at 682. Appellants' assertion that the 40 questions document is entitled to "substantial deference" in this circuit is incorrect. The cases they cite state that only the CEQ's NEPA regulations are binding; the "Forty Questions" publication, however, is not a regulation. See, e.g., Save Our Ecosystems v. Clark, 747 F.2d 1240, 1245 (9th Cir.1984); Southern Oregon Citizens Against Toxic Spray, Inc. v. Clark, 720 F.2d 1475, 1478 (9th Cir.1983), cert. denied, 469 U.S. 1028, 105 S.Ct. 446, 83 L.Ed.2d 372 (1984)
 Nevertheless, the mitigation plan was part of the original proposal because it was included in the original permit application. Appellants' interpretation of "original proposal" as being when Rayonier first began to fill the wetland illegally is implausible and unsupported. Even if the original fill activity constituted the "original proposal," the Corps would be justified in considering the mitigation agreement as a basis for not requiring an EIS. As stated by the District of Columbia Circuit, an EIS is not required if "the proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental consequences stemming from the original proposal." Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d at 682. The Corps properly considered the effect of the mitigation agreement in deciding not to require an EIS. See Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d at 987.
 
 
 [16]
 It is unclear exactly what appellants are contending. In support of their motion for summary judgment below appellants did argue that "significant adverse impacts can[not] be offset in any circumstances by 'mitigation' measures which do not mitigate or reduce the identified impact but rather attempt to compensate for it elsewhere ... the fact that compensation is provided elsewhere does not mean the Corps can close its eyes to the obviously unaltered significant impacts of the fill." Appellants further argued in opposition to Rayonier's motion for summary judgment that "Even if the Elk River purchase had been incorporated into the permit as a firm condition, the Corps' contention that no EIS need be prepared was highly questionable." Appellants' vague objections to the nature of mitigation virtually disappear from their brief on appeal, wherein they frame the issue presented as:
 Did the U.S. Army Corps of Engineers unreasonably decide not to prepare an environmental impact statement [EIS] for a wetlands filling project that it determined would have "significant" and "unacceptable" adverse impacts, where the Corps relied on a "mitigation plan" which only required a payment of money from the applicant?
 Appellants' Brief, page 1 (emphasis added). The only clear reference in the brief to the adequacy of off-site mitigations appears at page 17, where appellants claim that "Neither the purchase of the Elk River Site nor payment to the Game Department are in any way related to Rayonier's 18-acre fill." Id. at 17.
 Nevertheless, the issue of whether off-site mitigation may be used to excuse preparation of an EIS was raised at oral argument, and we feel compelled to address it.
 
 
 [17]
 We thus do not consider whether or under what circumstances off-site mitigation should be weighed or evaluated differently from on-site mitigation. There are obviously significant differences between the two, but no issue has been presented here regarding any possible different legal test for EIS purposes