**Brad BENNETT, et al., Plaintiffs,**

v.

**Michael SPEAR, in his official capacity as Regional Director, Region One, Fish and Wildlife Service, United States Department of the Interior, et al., Defendants.**

**No. 93–6076–HO.**

United States District Court, D. Oregon.

Jan. 20, 1998.

Robert D. Boivin, Boivin Jones Uerlings DiIaconi & Oden, Klamath Falls, OR, Larry Alan Sullivan, William F. Schroeder, Schroeder Hutchens & Sullivan, Vale, OR, Gregory K. Wilkinson, Best Best & Krieger LLP, Riverside, CA, for Brad Bennett, Mario Giordano, Langell Valley Irrigation and Horsefly Irrigation Dist.

Thomas C. Lee, U.S. Attorneys Office, Portland, OR, Maria A. Iizuka, U.S. Dept. of Justice, Environment & Natural Resources Div., Sacramento, CA, Christiana P. Perry,

Dept. of Justice, Environmental & Natural Resources Div, Washington, DC, for Secretary of Dept. of Interior.

Reginald R. Davis, Klamath County Counsel, Klamath Falls, OR, for Klamath County.

## ORDER

HOGAN, Chief Judge.

Plaintiffs bring this action under the Endangered Species Act and the Administrative Procedure Act, challenging two biological opinions issued by the Fish and Wildlife Service. Before the court are plaintiffs' Motion for Summary Judgment (# 43) and defendants' Motion for Summary Judgment (# 57).

## FACTS

The Klamath Project is a water storage and irrigation project serving approximately 240,000 acres of land in Southern Oregon and Northern California. The Klamath Project contains two major watersheds: the Klamath River basin and the Lost River basin. The Bureau of Reclamation (Reclamation) manages both watersheds, manipulating the flow of water for purposes of irrigation and flood control through a series of channels, reservoirs, diversions, canals, and dams.

In 1988, Lost River and shortnose suckers were listed as endangered based on a decline in the species' population due to a fragmentation of habitat by damming, flow diversion, and other forms of water manipulation, as well as decreased water quality. 53 Fed. Reg. 27130, 27131–32 (July 18, 1988).

After the suckers were listed as endangered, Reclamation and Fish and Wildlife entered a memorandum agreement to initiate informal consultation regarding the effects on the suckers of continued operation of the Upper Klamath and Clear Lake reservoirs, and Fish and Wildlife issued jeopardy findings regarding the 1991 and 1992 operation of the Klamath Project on the listed suckers. The memorandum also contemplated further consultation regarding long-term operating

criteria for the Klamath Project. Pl's Supp. E.R. (# 67), tab 2.

On July 22, 1992, Fish and Wildlife issued a biological opinion on the effects of long-term operation of the Klamath Project on the endangered suckers. Pl's E.R. tab 1. While the opinion conducted analyses of individual water bodies within the Klamath Project, it did not issue jeopardy findings with regard to these individual water bodies. *Id.* at 11–23.[1] Fish and Wildlife concluded that long-term operation of the Klamath Project "is likely to jeopardize the continued existence of the Lost River and shortnose suckers." *Id.* at 1.

With regard to Gerber reservoir (the portion of the 1992 opinion challenged by plaintiffs), the opinion observed that Gerber Reservoir "has been drawn to critically low levels for irrigation releases in the last two years" and that "the shortnose suckers sampled in April of 1992 showed signs of stress such as low body weight, poor gonadal development, and reduced growth rates of juveniles, which were probably related to low reservoir levels." *Id.* at 20. The opinion sets a minimum Gerber reservoir level of 4799.6 feet above sea level. *Id.*

In 1994, Reclamation requested reinitiation of consultation with Fish and Wildlife as a result of information gathered during the 1992 and 1993 operation of Clear Lake reservoir and a model developed by Reclamation that predicts the end of season lake elevation from the elevation at the beginning of the irrigation season. Pl's E.R. tab 5. Based on its model and information, Reclamation suggested a "hard floor" Clear Lake elevation equal to the minimum level in 1992, and a pre-season level which would ensure the elevation would not fall below the hard floor by season's end. On August 11, 1994, Fish and Wildlife amended its 1992 biological opinion by issuing new RPAs for the operation of Clear Lake reservoir. The August 11, 1994 opinion left intact the conclusion that continued operation of the Klamath Project was likely to jeopardize suckers.

---

1. The opinion also considered the Klamath Project's effects on the bald eagle, but found no likelihood of jeopardy.

Plaintiffs are a group of present and former farmers in the Langell Valley Irrigation (LVID) and Horsefly Irrigation (HID) districts. LVID receives its water from Clear Lake and Gerber Reservoir, while HID receives its water from Clear Lake and runoff from LVID. Plaintiffs challenge the July 22, 1992 biological opinion as it relates to Gerber reservoir and the August 11, 1994 biological opinion as it relates to Clear Lake.

## STANDARD OF REVIEW

Judicial review of agency action under the Endangered Species Act is controlled by section 706 of the Administrative Procedure Act, 5 U.S.C. § 706; *see also Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373–74, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (arbitrary and capricious standard applies to agency findings which involve agency expertise). Under this standard, an agency decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The agency's action may not be set aside so long as it has a "rational basis." *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Friends of the Earth v. Hintz,* 800 F.2d 822, 831 (9th Cir.1986). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The moving party must carry the initial burden of proof by identifying portions of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing whether a party has met this burden, the court must view the evidence and the inferences drawn from that evidence in the light most favorable to the non-moving party. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1284 (9th Cir.1982).

If the moving party meets its burden, the burden shifts to the opposing party to present specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party cannot rely solely on facts alleged in their pleadings to avoid summary judgment. *T.W. Elec. Serv. v. Pacific Elec. Contrs.,* 809 F.2d 626, 630 (9th Cir.1987). Instead, their response, by affidavit or otherwise, must set forth specific facts showing there is a genuine issue for trial. *Id.*

## DISCUSSION

The gravamen of plaintiffs' complaint is that the minimum lake elevations imposed by Fish and Wildlife with regard to Clear Lake and Gerber reservoir are arbitrary and capricious because Fish and Wildlife did not find, based on the best scientific and commercial data available, that the operations of Gerber reservoir and Clear Lake were likely to jeopardize Lost River and shortnose suckers. Defendants argue that Fish and Wildlife had no obligation to conduct a jeopardy analysis with respect to individual bodies of water and that its jeopardy finding as to the Klamath Project as a whole was adequate. The crucial issue, therefore, is whether Fish and Wildlife erred by analyzing the effects of the Klamath Project as a whole and then imposing lake-specific RPAs based on a single jeopardy finding or whether it was required to make jeopardy findings with respect to individual water bodies in order to issue lake-specific RPAs. This issue implicates considerations of Project interrelatedness and the propriety of lake-specific RPAs.

### 1. Interrelatedness

The regulations implementing and interpreting the ESA require Fish and Wildlife to

consider actions "interrelated" and "interdependent" to the proposed action in determining whether the proposed action poses jeopardy to an endangered species. 50 C.F.R. § 402.02. The regulations define "interrelated actions" as "those that are part of a larger action and depend on the larger action for their justification" and "interdependent actions" as "those that have no independent utility apart from the action under consideration." *Id.* The test for interrelatedness or interdependence is "but for" causation: but for the proposed project, would the other action occur? 51 Fed.Reg. 19932 (1986); *Sierra Club v. Marsh*, 816 F.2d 1376, 1387 (9th Cir.1987) (private development of hotel, convention center, and high-rise residential buildings not interrelated or interdependent to federal highway and flood control project).

■ Defendants contend they had a statutory duty to consider the Klamath Project as a whole because the operation of individual water bodies "depend for their justification" on the operation of the Project as a whole. The administrative record contains references that could be construed to support a conclusion that the water bodies are interrelated and interdependent with the Project as a whole. *See, e.g.* February 28, 1992 Biological Assessment; A.R.I.B.1 at 2–3 (shortnose suckers in Upper Klamath Lake believed to have gained access to other areas "by way of the features of the Klamath Project" and "Project has modified the natural storage and drawdown pattern in Clear Lake and Upper Klamath Lake to some degree"). However, neither the 1992 nor 1994 biological opinions addressed the interrelatedness or interdependence of Gerber or Clear Lake to the Klamath Project as a whole, and this court is not qualified to determine, based on this record, whether the operation of Clear and Gerber Lakes depend on the operation of the Klamath Project. On remand, Fish and Wildlife shall determine whether the operation of Clear Lake and Gerber Reservoir are interrelated or interdependent with the operation of the Klamath Project as a whole, i.e. whether operation of the Klamath Project as a whole has material effects on the operation of Clear Lake and Gerber reservoirs.

## 2. Reasonable and Prudent Alternatives (RPAs)

■ Plaintiffs also challenge the RPAs issued with regard to Clear Lake and Gerber reservoirs. The ESA requires that, upon a finding of jeopardy, the Secretary of the interior "shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) of this section," i.e. that would not likely jeopardize the continued existence of an endangered species. 16 U.S.C. § 1536(b)(3)(A). The RPAs must be based on the "best scientific and commercial data available." 50 C.F.R. § 402.14(g). Finally, the APA required Fish and Wildlife to base its findings on a reasoned evaluation of the relevant factors. *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851.

■ Perhaps due to the precedential posture of this case, relevant case law appears to be lacking on the issue of the required nexus between RPAs and jeopardy. However, the implicit requirement that an RPA be "alternative" to jeopardy, the requirement that RPAs be based on the best data scientifically available, and general administrative law doctrines, all support the conclusion that RPAs must be rationally related to the purpose of avoiding jeopardy. The record in this case does not support a finding that the minimum lake elevations and other RPAs in Clear Lake and Gerber reservoirs will help avoid jeopardy to suckers either in those lakes individually or in an action area that is independent or interrelated to those lakes. On remand, Fish and Wildlife shall determine whether the RPAs regarding Clear Lake and Gerber reservoir are likely to help avoid jeopardy to suckers in those lakes or in interdependent or interrelated areas.

## CONCLUSION

This proceeding is remanded to the Secretary of the Interior for further consideration consistent with this opinion. The parties are allowed 30 days to consult and suggest a date by which Fish and Wildlife must issue findings consistent with the above reasoning. During this time, all challenged RPAs and regulations shall remain in effect. Plaintiffs' Motion for Summary Judgment (# 43) is

granted and defendants' Motion for Summary Judgment (# 57) denied to the extent indicated above.