**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

B&B PARTNERSHIP; B&B
PISCATAWAY, INCORPORATED; BEVARD
FAMILY LIMITED PARTNERSHIP,
Plaintiffs-Appellants,

v.                                                          No. 96-2025

UNITED STATES OF AMERICA,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-93-2866-PJM)

Argued: July 15, 1997

Decided: December 24, 1997

Before MURNAGHAN, Circuit Judge, and BUTZNER and
PHILLIPS, Senior Circuit Judges.

_____

Affirmed by unpublished opinion. Senior Judge Butzner wrote the
opinion, in which Judge Murnaghan and Senior Judge Phillips joined.

_____

**COUNSEL**

**ARGUED:** Robert David Sokolove, SOKOLOVE & ASSOCIATES,
Bethesda, Maryland, for Appellants. Daniel Richard Dertke, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellee. **ON BRIEF:** Susan M. Kayser, SOKOLOVE & ASSO-

CIATES, Bethesda, Maryland, for Appellants. Lois J. Schiffer, Assistant Attorney General, Environment and Natural Resources Division, M. Alice Thurston, Andrew C. Mergen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

BUTZNER, Senior Circuit Judge:

The appellants, B&B Partnership, B&B Piscataway, Inc., and Bevard Family Limited Partnership (collectively referred to as B&B), challenge the Army Corps of Engineers' denial of a section 404 discharge permit. 33 U.S.C. § 1344. The permit would have authorized B&B to fill 1.5 acres of wetland in Prince George's County, Maryland, as part of a proposed rubblefill project. Both parties moved for summary judgment. The district court upheld the Corps' decision.

B&B stated the issues on appeal as follows:

> I.  Whether the District Court Erred in Excluding Documents from the Judicial Review of the Corps of Engineers' decision, specifically the Chesapeake Terrace and Brandywine Rubblefill Documents, Whose § 404 Permit Applications Were Distinguished and/or Relied Upon as Bases for Denying Appellants' § 404 Permit.
>
> II. Whether the Army Corps of Engineers' Denial of Appellants' Permit Was Arbitrary and Capricious, an Abuse of Discretion, or Otherwise Not in Accordance With the Law.

I

B&B applied to the Corps for a permit in connection with its plan to locate a rubble landfill at a 69 acre site in Prince George's County,

2

Maryland. A rubble landfill or rubblefill is a disposal site for nonpolluting construction debris, such as concrete, asphalt, glass, steel, and vegetation. B&B selected the site, in part, because of its favorable topography. The site includes a natural ravine in which B&B planned to deposit the debris. It was estimated that the ravine, which covers approximately 49 acres, would hold about 2,000,000 cubic yards of fill.

B&B began the state and local planning processes for the rubblefill in 1985. As originally conceived, the project did not impact wetlands. B&B's uncontroverted expert reports indicate that no wetlands existed in the ravine in 1985. Although a portion of Tinkers Creek traverses the western edge of the site, the plan as originally designed did not disturb that area.

During the planning process, B&B was asked to minimize the traffic impact on the neighboring community by accessing its site from the west, across Tinkers Creek. B&B agreed and applied to the Corps for a permit to fill 0.4 acres of wetland for the purpose of building a temporary access road across the creek.

Sometime during 1988 or 1989, a wetland emerged along the base of the ravine. An intermittent stream began to flow saturating the soils and bringing forth wetland vegetation. The stream and the wetlands drain into Tinkers Creek, which joins the Piscataway Creek, a major tributary to the Potomac River. The Potomac flows into the Chesapeake Bay. By 1990, the ravine contained 1.1 acres of wetland, and wetland vegetation accounted for 10% of the ravine's plant life. Because of this development, B&B submitted a revised permit application, requesting authorization to fill the ravine wetlands. With its application, B&B included an alternatives analysis that claimed no practicable alternatives existed. B&B attempted to show that the rubblefill was in the public interest.

The Corps gave public notice of B&B's proposal and solicited comments. The Corps received comments from the Fish and Wildlife Service (FWS), the National Marine Fishery Service (NMFS), the Environmental Protection Agency (EPA), and private citizens. The comments received from the FWS, the NMFS, and the EPA recommended denial of the permit. The Corps received 43 letters from pri-

vate citizens that opposed the project. The letters generally described how the project would hinder the efficient functioning of the wetlands. One citizen feared that the site would "fall prey to the same piecemeal [ecological] destruction that . . . claimed nearly three-fourths of the county's swamps and marshes." Another was disturbed by the damage that the project would do to the bald eagle nesting site on the property. In summary, the letters showed that citizens were troubled by noise, traffic, and water pollution that the project would bring to the area. After reviewing the comments and evaluating B&B's application, the Corps forwarded copies of the comments to B&B and indicated that it was inclined to deny the permit.

B&B then modified the plan in an attempt to address certain concerns expressed by the Corps and the other federal agencies. It also submitted a more comprehensive alternatives analysis. After reviewing these materials, the Corps expressed its continued dissatisfaction with B&B's proposal. The Corps did not submit B&B's supplemental materials to the public or the federal agencies for additional comments.

On April 5, 1993, the district engineer (DE), who was charged with making the final decision, officially denied the permit and issued a statement of findings. He concluded that the detrimental environmental impacts of the project outweighed its benefits and that the project was contrary to the public interest. He also concluded that B&B had not demonstrated the absence of practicable alternatives.

At the time the DE rendered the decision, B&B had received all but one of the permits it needed from Maryland and Prince George's County. The outstanding permit, a state water quality permit, was issued after the Corps denied B&B's permit. B&B invested over $500,000 to secure state and local approval.

B&B then challenged the Corps' decision in district court. The district court affirmed denial of the permit by granting the Corps' summary judgment motion.

II

The first issue on appeal is whether the district court abused its discretion by denying B&B's motion to supplement the administrative

4

record. In its motion, B&B sought to add to the record the Corps' documents relating to two other rubblefills located in Prince George's County, the Brandywine rubblefill (Brandywine) and the Chesapeake Terrace rubblefill (CT), both of which had obtained section 404 permits. B&B contends that a review of the permit applications for those rubblefills reveals that the Corps' decision to deny B&B's permit was arbitrary and capricious.

B&B argues that these documents should be viewed as part of the administrative record because the Corps relied on those materials when it evaluated B&B's application. As support for this claim, B&B cites the DE's findings which state that Brandywine is an existing, alternative rubble disposal site located near B&B's proposed site. B&B also relies on an internal Corps memorandum that briefly documents the differences in the environmental conditions existing at B&B's proposed site and the CT site.

We review the district court's decision to deny B&B's motion to supplement the record for abuse of discretion. Inland Empire Public Lands Council v. Glickman, 88 F.3d 697, 703-04 (9th Cir. 1996). Judicial review of an agency decision is generally based on the record developed before the agency. Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985). The record includes "everything that was before the agency pertaining to the merits of its decision." Portland Audubon Soc. v. Endangered Species Comm. , 984 F.2d 1534, 1548 (9th Cir. 1993). When the record prepared by the agency and submitted to the court omits evidentiary material that the agency relied on to reach its decision, it is appropriate to add the omitted materials to the record. Id.

The district court acted within its discretion when it determined that the Corps did not rely on either the Brandywine or the CT documents to evaluate B&B's application. The references to Brandywine and CT do not support a contrary inference. The DE's reference to the Brandywine site shows only that the Corps was aware of an alternative rubblefill operating in the area. The DE's acknowledgment of this basic, pertinent, and publicly known fact does not show that he relied on any evidence or materials related to Brandywine's section 404 permit application when evaluating B&B's proposal.

5

Similarly, the memorandum that discusses the differences between the CT site and B&B's proposed site does not demonstrate that the Corps relied on CT's permit application or other related materials to evaluate B&B's application. The memo does not suggest that the evaluation of the merits of B&B's application was altered by facts or evidence related to the CT site. Instead, the memo merely sets forth the environmental conditions existing at each site:

>  1. The following information is provided in order to clarify the site differences between B&B Partnership's landfill site pending denial and the Chesapeake Terrace Rubble Landfill for which a Department of the Army (DA) permit is being issued.

> . . .

>  3. The Chesapeake Terrace site is an abandoned sand and gravel quarry in Anne Arundel County. The wetlands to be impacted by the actual rubble fill are relatively low quality emergent wetlands formed in shallow depressions caused by mining activity. These shallow emergent wetlands contain only mono-typic vegetation and most likely "dry-up" during the summer months. The area adjacent to these wetlands is basically a barren sand and gravel landscape with no habitat value. Other more valuable wetlands on this site will not be impacted and are to be protected by a conservation easement. Mitigation is also to be performed.

>  4. Regarding the B&B site, the rubble is to be placed in a naturally occurring steep sloped ravine. The ravine contains an ephemeral to intermittent stream at the bottom with adjacent forested wetlands. The slopes of the ravine are heavily forested (climax stage). The project would involve piping and filling the stream to create the substrate for the landfill and the removal of all forest up to the top of the ravine. The area also provides quality wildlife habitat.

The memo does not suggest that the Corps relied on any information or materials related to the CT site to reach, or to support, its findings about the environmental conditions at B&B's site. Those conditions

6

--such as the existence of the stream, the location and evaluation of the forest, and the suitability of the area for wildlife--reflect site-specific information, unrelated to the CT site. The memorandum observes that each decision is warranted by the conditions existing at the respective sites. This is not a situation in which the Corps relied on another application to justify its denial of B&B's permit. Rather, the reasons for the Corps' decision, as documented in its statement of findings, relate to the particular environmental impacts on the proposed site. In short, the CT documents do not pertain to the merits of the Corps' decision about B&B's application.

B&B did not demonstrate that the Corps relied on either the Brandywine or CT documents when it evaluated B&B's application. The district court did not abuse its discretion by holding that the documents should not be considered part of the administrative record.

III

The next issue is whether the Corps' decision to deny the permit was arbitrary and capricious. The Administrative Procedures Act (APA) establishes the standard for judicial review of a Corps decision. Friends of the Earth v. Hintz, 800 F.2d 822, 830-31 (9th Cir. 1986). According to the prescribed standard, the Corps' decision must be disturbed if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds, Califano v. Sanders, 430 U.S. 99 (1977). When a court reviews the substance of an agency decision under the arbitrary and capricious standard, it must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. at 416."Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." Id. "The court is not empowered to substitute its judgment for that of the agency." Id.

Section 404 of the Clean Water Act authorizes the Secretary of the Army, acting through the Corps of Engineers, to issue permits allowing, among other things, the discharge of fill into waters of the United States. 33 U.S.C. § 1344(a). In the absence of a permit, the Act prohibits such discharges. 33 U.S.C. § 1311(a).

The evaluation process for a section 404 permit application is prescribed by regulation. See 33 C.F.R. §§ 320.4 et seq. In order to receive a permit, an applicant must clear two hurdles. The applicant must demonstrate that the proposed project satisfies the EPA's section 404(b) guidelines, which begin at 40 C.F.R. § 230. See 33 U.S.C. § 1344(b); 33 C.F.R. § 323.6(a). The EPA's guidelines specify that a permit should not issue if "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem . . . ." 40 C.F.R. § 230.10(a).

In addition to determining if the project meets the criteria established by the guidelines, the Corps must conduct an independent assessment of the project's merits to determine whether it is in the public interest. 33 C.F.R. § 323.6(a). This public interest review, as it is called, involves weighing the project's benefits against its detriments, including the cumulative impact of the proposed project. 33 C.F.R. § 320.4. If the proposal does not satisfy the guidelines or if it is judged not to be in the public interest, the Corps must deny the permit. The Corps' public interest review involves an examination of the project's overall impact. Factors taken into consideration include:

> . . . conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, consideration of property ownership, and, in general, the needs and welfare of the people.

33 C.F.R. § 320.4(a)(1). If, after examining these factors, the Corps decides a project is contrary to the public interest, no permit will be issued. Id.; 33 C.F.R. § 323.6(a). When the Corps reaches a final decision, it is obliged to prepare a report setting forth its findings and conclusions. 33 C.F.R. § 325.2(a)(6).

IV

The Corps articulated a rational basis for denying B&B's permit. After reviewing the relevant factors, the Corps concluded that the

project would cause substantial adverse environmental impacts. Those impacts include "wetland function and value loss, loss of valuable wildlife habitat, removal of the area's food chain support capabilities, degraded local air quality, and increased noise." In the Corps' view, these adverse impacts outweighed the project's benefits, making the project contrary to the public interest. The Corps also concluded that B&B had not clearly demonstrated the absence of practicable alternatives. As the district court found, the project's negative environmental impacts provide a rational basis for the Corps' decision.

B&B argues that the Corps' conclusions about environmental impacts are not supported by facts in the record. Specifically, B&B claims the record does not establish that the project will adversely affect fish and wildlife, the area's food chain production capabilities, water quality and wetlands, air quality, and noise levels.

Contrary to B&B's assertion, the record does include evidentiary support for the Corps' findings. To evaluate B&B's application, the Corps reviewed the proposed physical changes involved in creating the rubblefill. The Corps then, with the aid of the FWS and the NMFS, examined the site to assess the environmental conditions that exist there. Finally, applying its scientific expertise and its general knowledge of local natural resources, the Corps determined how the proposed physical changes were likely to effect the environment.

By filling the ravine with debris, B&B's plan would eliminate the 1.1 acres of ravine wetland and .4 acres of wetland for the stream crossing, although the latter disturbance would be for a temporary period of 10 years. Filling the ravine would also eliminate the established forest located there. Undeniably, destruction of the ravine wetlands and forest would eliminate the wildlife habitat and food production provided by those resources. Loss of the wetlands means that the headwater stream that empties into Tinkers Creek would also be lost.

The Corps determined that the physical changes contemplated by B&B's plans would have additional environmental impacts. First, the Corps found that filling the ravine would eliminate or displace the wildlife inhabiting the area. It also found that the wildlife in the surrounding lands would be impacted because the ravine is an integral

9

part of the surrounding ecosystem. The Corps based those findings on its review of B&B's plans, inspections of the site, and the report prepared by FWS biologists based on their site inspection.

Next, the Corps determined that elimination of the headwater stream would add to the cumulative negative impact on environmental resources caused by the loss of other headwaters in the area. The Corps also determined that the wetlands involved here are particularly valuable because few such undisturbed sites remain in Prince George's County.

In agreement with the district court, we conclude that the evidence in the record provides a rational basis for the Corps' denial of B&B's application for a permit.

V

In addition to challenging the evidentiary basis of the Corps' decision, B&B asserts that the Corps did not adhere to regulatory procedures. Specifically, B&B contends that the Corps was required to submit the supplemental materials, which B&B had provided in response to the public comments, to FWS, NMFS, and EPA for their review. In particular, B&B notes that its supplemental materials addressed the concerns raised by the FWS about the bald eagle's nest located on the property adjacent to the site.

The Corps' regulations state that the "district engineer will issue a supplemental, revised, or corrected public notice if in his view there is a change in the [permit] application data that would affect the public's review of the proposal." 33 C.F.R. § 325.2(a)(2). This regulation plainly does not require the Corps to issue such a notice and accept additional comments whenever an applicant submits supplemental material. The Corps is required to do so only when the DE believes that the supplemental materials would affect the public's view.

In this case, the DE decided not to seek additional comments. In doing so, he did not abuse his discretion. The supplemental materials submitted by B&B did not ameliorate the principal negative environmental impacts caused by filling the ravine. While it is true that the

10

plan modifications offered greater protection for the bald eagle's nest, that concern was not one of the principal bases for the Corps' decision. Because the Corps was not required to solicit additional comments, B&B's procedural claim is without merit.

The district court's judgment is affirmed.

AFFIRMED

11